523 P.2d 1327

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, a Delaware corporation, Appellant,**

v.

**Melanie LUECK, in her Individual capacity and as surviving widow of William T. Lueck, Appellee.**

**No. 2 CA–CIV 1578.**

Court of Appeals of Arizona, Division 2.

July 11, 1974.

Rehearing Denied Sept. 24, 1974.

Review Granted Jan. 28, 1975.

Bilby, Thompson, Shoenhair & Warnock, P. C. by Harold C. Warnock, and Richard M. Bilby, T. Scott Higgins, Tucson, for appellant.

Barber, Haralson, Giles & Moore by D. Dale Haralson, Tucson, for appellee.

## OPINION

HOWARD, Judge.

Appellee instituted an action for the alleged wrongful death of her husband resulting from a collision between appellant's train and a truck driven by the deceased. A trial before a jury resulted in a verdict against appellant in the sum of $2,000,000 compensatory damages and $1,080,000 punitive damages. The engineer and fireman of the train, also named as defendants, were exonerated by the jury.

Appellant has cited many alleged errors of the trial court including excessive damages. We need not discuss all the issues raised by appellant since we agree with its contention that the court erred in instructing the jury on gross or willful and wanton negligence in the absence of any evidence to support such instruction.

The facts, stated in the light most favorable to the giving of such instruction are as follows. The accident occurred November 29, 1966 at 1:00 p. m., a clear day, at the Maley Street crossing in Willcox, Arizona. The crossing consisted of one main track and three feeder tracks. Before colliding with the train the deceased drove by the following warning devices: (1) a standard metal advance warning sign, yellow background with black printing, on the right-hand side of the street as he approached the crossing, 100 feet from the track; (2) a standard advance warning sign painted in eight-foot letters on the pavement, 14 feet from the track; (3) standard railroad cross-bucks located on both sides of the track at the intersection; (4) four # 8 flashing red lights eight inches in diameter, with warning bells, located on both sides of the crossing, all of which were clearly visible; (5) cantilever flashing red lights which extended over the cen-

ter of the inside traffic lane (the lane in which Mr. Lueck was traveling as he approached the crossing); (6) a square black sign with white lettering warning "STOP ON RED SIGNAL". It is uncontroverted that, at the time of the accident, all of the flashing lights and warning bells were operating.

The train in question was what is known as a "work train" which consisted of an engine and a caboose. It was traveling from Bowie to Willcox. At the time of the accident the engine was running backwards, a movement for which it is specifically designed. The headlights of the engine were on, although an oscillating white light on the front of the engine was not visible because of the backward position. The work train was one and one-half to two minutes behind a freight train known as the "Blue Streak Manifest" (BSM) which was proceeding in the same direction. It was established that from a point 206 feet from the track an approaching train would have been visible to a motorist when it was over 1,000 feet from the crossing. At the point where the warning lights and cross-bucks were located the driver's view down the tracks was unimpeded. According to appellee's reconstruction expert, the train was going at a speed of 70 mph when it hit the truck driven by the decedent.[1] The speed limit at the crossing normally was 60 mph. Since the work train was following another train, it had a yellow signal prior to the Maley crossing which, under company rules, required it to proceed at 40 mph in order to avoid running into the other train. Approximately one quarter to three eighths of a mile away another freight train was waiting on a side track until the work train cleared.

According to the fireman the train was approximately 300 yards from the crossing when the Lueck vehicle was observed. The truck was 75 feet from the crossing and going at a steady five miles per hour.

The testimony of the fireman was as follows:

"Q. Sir, did you tell Mr. Rhoades [the engineer] about the truck as soon as you first saw it?

A. Yes, sir.

Q. And could you tell us what you told Mr. Rhoades when you first—when you saw the truck?

A. I mentioned to him it was a sand truck loaded with sand. It seemed to have a problem of slowing down. I wasn't sure whether he was going to stop or not.

Q. So your first comment to Mr. Rhoades was that there was a sand and gravel truck approaching and I believe if I recall your deposition testimony, you said, 'Mack, I don't think he is going to stop.' Does that sound correct, sir?

A. Yes, sir, it does.

Q. And could you tell us, sir, what Mr. Rhoades said to you at that time?

A. I can remember correctly, he says, 'Keep your eye on it.'

Q. Keep your eyes on him?

A. Yes, sir.

Q. And did you keep your eyes on him, sir?

A. I certainly did.

Q. How long did you keep your eyes on him before you told Mr. Rhoades to apply the emergency?

A. Well, I never let my eyes off of him because I figured he was going to stop.

Q. I have got a bad question. My question is: How long after Mr. Rhoades said keep your eyes on him was it before you told him to big-hole it?

A. I thought the man was going to stop.

Q. Sir, my question was: How long was it from the time—

A. I thought he wasn't going to stop?

---

1. Appellant's testimony was that the train was going 45–50 mph.

Q. From the time Mr. Rhoades said keep your eye on him, how long from that point was it that you told Mr. Rhoades to apply the emergency brake?

A. Fifteen, 20 seconds.

Q. And when you did tell Mr. Rhoades, what did you do when you told Mr. Rhoades to big-hole it?

A. I said, 'Mack, he is not going to stop. Big-hole it.' And I shut the window.

Q. And when you said he is not—

A. The one on the engineer's side.

Q. And when you said he is not going to stop, big-hole it, why did you shut the window?

A. Because I was afraid material would come in the cab with us.

Q. By material, I guess you could be talking about sand and gravel as well as fuel; is that correct, sir?

A. Fuel and parts.

Q. And how long after you said that was it until the impact occurred?

A. Well, it happened so fast. I couldn't tell you just—because I was shutting the window and hollered at Mack and I was going over to the side, so—

Q. Where were you in the cab of the locomotive when the impact hit?

A. On the engineer's side.

Q. Up against the other side?

A. Well, he was sitting down here and I am standing up here looking at him.

Q. Were you in front of him.

A. No, off to the side.

Q. Which side were you—

A. It would be the left side.

Q. Were you—

A. I would come from the right side to the left side.

Q. Did you pass behind him?

A. No, just stood in front of him.

Q. All right.

\* \* \* \* \* \*

Q. (By Mr. Haralson) Mr. Garigan, thinking back over your testimony as I recall thus far, you indicated that some 20 seconds before you told Mr. Rhoades to big-hole it was when you first saw the truck and said, 'Mack, there is a sand and gravel truck approaching. I don't think he is going to stop.' Is that correct, sir?

A. Yes, sir.

Q. And then I believe you said from that point in time about 20 seconds later was when you told him to big-hole it?

A. In that neighborhood, sir.

Q. And so he big-holed it at that time which was, I believe, you estimated roughly 20 seconds before impact; correct, sir? That was your testimony?

A. Yes, sir.

Q. Sir, how many times between the time you first told him, Mr. Rhoades, you didn't think he was going to stop, and the time you actually told him to big-hole it; how many other times did you indicate that you didn't think that he was going to stop?

A. To my knowledge, twice and maybe three times.

Q. So you indicated to him two to three times in addition to the first one that you didn't think Bill was going to stop; is that correct, sir?

A. To my knowledge, yes.

Q. And then at approximately the fifth time, you said he is not going to stop, big-hole it?

A. (Affirmative nod.)

Q. And he did; is that correct, sir?

A. Yes, sir.

Q. At what point in time through there, let's say, we have got five times counting the first time and the time that you said big-hole it, which one of those times approximately was the time that you closed the window to keep the sand and fuel out?

A. The last time."

The testimony was uncontradicted that one-fourth of a mile from the intersection the engineer began blowing a crossing warning on his whistle and that the warning continued up to the time of impact. Both the engineer and fireman testified that if the emergency brakes had been applied when they first saw the truck there still would have been a collision.

Prior to 1961 the railroad crossing at Maley Street had only flashing lights. In 1961, the cantilever flashing lights were added, making a total of six flashing red lights. In 1965, a predictor system was added which assured a uniform warning of twenty to thirty seconds, regardless of the speed of the train, to all motorists approaching the crossing. In the period from 1963 to 1965, there were four accidents at the crossing. None of the accidents resulted in a fatality. One of the accidents was due to brake failure on the part of the automobile and the other three accidents were due to inattention on the part of the motorists. Nor was there any testimony that the accidents were a result of the drivers being confused by the signals. In 1965, appellant induced the City of Willcox to change the speed limit at the intersection from 30 mph to 60 mph. Although Southern Pacific's experts testified that the crossing should have been reevaluated when the speed limit was changed, they all were of the opinion that the warning system at the intersection was adequate.

Appellee introduced into evidence a study made by a Southern Pacific employee in the State of California which concluded that warning gates reduced fatalities by 91%, injuries by 78% and accidents by 62%.[2] The survey also indicated there were more fatalities at crossings where only signs were erected and more accidents at crossings with only automatic signals. There was no showing that the automatic signals were of the same type as in this case. It included wigwags and all types of automatic signals. In 1966, the traffic over the Maley Street crossing consisted of 2,700 to 3,000 vehicles per day. Two Southern Pacific employees testified that had they been aware of the various surveys prior to the accident they would have recommended the installation of gates. But they also stated unequivocally that the protection at the crossing at the time of the accident was reasonable.

The evidence also showed that prior to the accident it was recommended that gates be installed at the Maley Street crossing and that Southern Pacific was in the process of negotiating with the City of Willcox for construction of the gates. The railroad always attempted to have the municipality share in the cost of construction of the gates and it normally took about six months to erect the gates and install the new system. However, at especially dangerous crossings, Southern Pacific had undertaken to install the gate system in less time and without having a firm cost-sharing agreement.

■■ Southern Pacific claims the verdict in favor of the fireman and engineer exonerated Southern Pacific as far as any responsibility for negligence in the operation of the train and therefore the only negligence the jury could have found was in the maintenance of the crossing. While acquittal of the servant when the sole theory is respondeat superior acts to exonerate the principal, 57 C.J.S. Master and Servant, § 619, p. 423 (1948); cf. Miracle Mile Bottling Distributing Co. v. Drake, 12 Ariz.App. 439, 471 P.2d 741 (1970), this principle does not apply when another servant, not named as a defendant, might have been responsible for the negligence. As appellee points out, the conductor of the train was not named as a defendant. The conductor, Mr. Stiver, testified that he was in charge of the operation of the train and was also the one who decided that the train should be run in a backup position. But even accepting appellee's position, we

2. The gates are not "fail safe". The evidence showed that motorists drive around the gates and even crash through them.

are unable to see any evidence in the operation of the train which could justify the giving of a gross negligence instruction. The court instructed the jury that if it found Southern Pacific guilty of gross or wanton or willful negligence, then the defense of contributory negligence would not apply. While normally the issue of gross negligence is a question of fact for the jury, it does not become a question of fact when there is an absence of evidence justifying submission of the issue to the jury.

Courts do not encounter any difficulty defining gross or wanton or willful misconduct, but a survey of the cases reveals a difference of judicial opinion throughout the country as to what conduct, in the context of a particular fact situation, constitutes gross negligence. In Barry v. Southern Pacific Co., 64 Ariz. 116, 166 P.2d 825 (1946), the Arizona Supreme Court quoted with approval from the Restatement of Torts § 500 which reads as follows:

"The actor's conduct is in reckless disregard of the safety or another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." 64 Ariz. at 121, 166 P.2d at 828.

In Scott v. Scott, 75 Ariz. 116, 252 P.2d 571 (1953), Justice LaPrade said:

"Wanton negligence is highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air', so to speak. It is flagrant and evinces a lawless and destructive spirit." 75 Ariz. at 122, 252 P.2d at 575.

In Kemp v. Pinal County, 13 Ariz.App. 121, 474 P.2d 840 (1970), we stated:

"Gross or wanton or willful misconduct is different from ordinary negligence in quality and not degree. A person can be very negligent and still not be guilty of gross negligence." 13 Ariz.App. at 124–125, 474 P.2d at 843.

In the case of Sun Oil Company v. Seamon, 349 Mich. 387, 84 N.W.2d 840, 849 (1957), Justice Smith wrote:

"Wanton misconduct is a different kind of offense than ordinary negligence, even though it be gross. Fault is involved in both, but in the one the fault of the callous, the brutish, the quasi-criminal, in the other the human frailty of lack of care, of inattention, of diversion. These are faults of different hues in the spectrum of human conduct . . . ."

Although the work train was traveling at a speed greater than authorized by company policy, it was only 10 mph over the speed limit set for the crossing. The 40-mph speed limit indicated by the yellow light was to prevent the train from running into the rear of the BSM which preceded it. When the truck was first observed, it was traveling at a slow rate of speed and was not in a position of peril until the very last minute when it proceeded onto the track and was instantly struck.

Prior to that time it was in a position of safety, slowly approaching the tracks at a point where nothing obstructed the sight and sound of the approaching train. The failure to apply the emergency brake when the truck was first spotted did not constitute gross negligence, nor did the combination of the crew's conduct constitute gross negligence.

This brings us to the "meat" of the case. Appellee maintains that the railroad was guilty of gross or willful or wanton conduct by not installing gates. Not one single witness testified that the crossing was dangerous. Appellee's theory is that the crossing was extremely hazardous. This is based on the facts that (1) a motorist might be confused, when he sees the signs flashing and the bells ringing, as to whether they are warning of the existence of a switching operation or a through train and (2) a motorist approaching the in-

tersection might see a train go through and see the lights flashing and then, due to driver inadvertence, take his eyes off the lights and not see the lights go off. When his attention is focused back to the intersection he might see them flashing again and think they were still flashing for the train that had passed. In both instances appellee claims that the motorist might, because of this "confusion", go across the track while the bells were still ringing and the lights still flashing. The answer to appellee's contention is evident. By what right does the motorist proceed across the tracks when the warning bell is sounding and the lights are flashing? In the case of Southern Pacific Co. v. Baca, 77 Ariz. 173, 268 P.2d 968 (1954), the train was alleged to have gone through the town of Tempe at a speed of 40 mph, double the speed limit. The language in *Baca* is quite appropriate for this case:

"We are of the view that even though train No. 370 was making 30 to 40 mph through the town of Tempe on that date, this act alone did not constitute wanton negligence as above defined. In view of the fact that flashing lights and bell ringing signals had been installed by the Railroad at said Eighth Street crossing, which gave unmistakable warning that a train was in close proximity to the crossing, and in view of the fact that section 101, chapter 3, Session Laws of 1950, section 66–168, A.C.A.Cum.Supp. 1952, provides that:

'(a) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:

'1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train'.

and section 66–186, A.C.A.Cum.Supp. 1952, which provides:

'It is a misdemeanor for any person to violate any of the provisions of this act (sections 66–151—66–189) unless such violation is by this act or other law of this state declared to be a felony.'

Excessive speed under such circumstances in our opinion, would not lead reasonable men to realize that it would create an unreasonable risk of bodily harm to persons lawfully using a railroad crossing and particularly West Eighth Street in Tempe where flashing lights were clearly visible and bell-ringing signals clearly heard, nor would the knowledge of such facts involve a high degree of probability that substantial harm to such persons would result therefrom." 77 Ariz. at 179, 268 P.2d at 971.

Appellee cites the case of Alires v. Southern Pacific Co., 93 Ariz. 97, 378 P.2d 913 (1963), as being in point. We do not agree. In *Alires* the crossing was located in a heavily traveled area near a Reynolds Aluminum plant which changed shifts around midnight. The Reynolds plant bordered the Southern Pacific right-of-way. The parking and outside working lights were brightly illuminated by overhead lights so that the motorist in the position of a driver watching for a train would look into the lights of the plant area. The Golden State, the train in question, was approximately one hour and forty minutes late at its last stop and was traveling 79 mph. As the court stated:

"Other than the customary wooden crossarm near the railroad tracks, there were no signals maintained by the railroad such as an automatic wigwag to attract the attention of a driver of a motor vehicle to the possibility of an approaching train. It was a winter's night. There was, accordingly, a high degree of probability that the windows on an approaching vehicle would be up." 93 Ariz. at 109, 378 P.2d at 921.

Nor do we find the facts in this case similar to those in Olea v. Southern Pacif-

ic Company, 272 Cal.App.2d 261, 77 Cal. Rptr. 332 (1969) where the same survey which was introduced in evidence in the case at bench was introduced. In the California case there was a grade approach which impaired the vision of vehicular traffic and the crossing was marked only by wigwag signals which apparently had ceased operating and permitted traffic to come on to the tracks even though a train might have been approaching the crossing. It did not have a predictor system. A particularly dangerous situation existed because of the obstructed view of the rapidly approaching train by a slow moving switching train proceeding away from the crossing.

There is no question in this case of a defective or misleading automatic signal. We are unable to agree with appellee's contention that the failure to install "the ultimate" in crossing safety devices in this case constituted gross or wanton or willful misconduct.

Reversed and remanded.

HATHAWAY, C. J., and KRUCKER, J., concur.