535 P.2d 599

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, a Delaware Corporation, Appellant,**

v.

**Melanie LUECK, in her individual capacity and as surviving widow of William T. Lueck, Appellee.**

**No. 11768–PR.**

Supreme Court of Arizona,
In Banc.

April 25, 1975.

Rehearing Denied June 3, 1975.

**562**

Bilby, Thompson, Shoenhair & Warnock by Harold C. Warnock, Richard M. Bilby, Tucson, for appellant.

Barber, Haralson, Giles & Moore by D. Dale Haralson, Tucson, for appellee.

The Association of Trial Lawyers of America, Arizona Branch by Robert G. Begam, Phoenix, amicus curiae.

STRUCKMEYER, Vice Chief Justice.

This is an appeal from a verdict of a jury and a judgment in an action for wrongful death at a railroad crossing. The jury in a unanimous verdict awarded $2,000,000, compensatory, and $1,080,000, punitive damages to Melanie Lueck, the surviving widow of William T. Lueck, deceased, and their two children, ages six years and 18 months. The Court of Appeals, 22 Ariz.App. 90, 523 P.2d 1327 (1974), reversed, expressing the view that the evidence was not sufficient to submit to the jury the question as to whether the deceased's contributory negligence was barred by the defendant's wanton negligence. Decision of the Court of Appeals vacated.

We think it is first appropriate to review the law relevant to a determination of wanton and willful negligence in this case. Since Southern Pacific R. R. Co. v. Svendsen, 13 Ariz. 111, 108 P. 262 (1910), wanton negligence has been a bar to the defense of contributory negligence. There, the court approved the statement:

> "The doctrine that contributory negligence will defeat recovery has no application where the injury is the result of the willful, wanton, reckless conduct of defendant." 13 Ariz. at 117, 108 P. at 264, 265.

The definition of wanton negligence as found in the Restatement of Law, Torts, was adopted in Arizona in 1945, Womack v. Preach, 63 Ariz. 390, 163 P.2d 280 (1945), and has been followed since. Conduct is wanton if a defendant intentionally does or fails to do an act, knowing or having reason to know of facts which would lead a reasonable man to realize that his conduct not only created an unreasonable risk of harm to another but involved a high degree of probability that such harm would result.

The Restatement of Law, Second, although defining wanton negligence in terms of reckless conduct, appends this informative comment:

> "a. *Types of reckless conduct.* Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know, as that term is defined in § 12, of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it." (Comment *a* to § 500, at 587, 588.)

Willful misconduct means intentional, wrongful conduct, done either with knowledge that serious injury to another probably will result or with a wanton and reckless disregard of the possible results and is essentially a question of fact. Olea v. Southern Pacific Company, 272 Cal.App.2d 261, 77 Cal.Rptr. 332 (1969).

"The usual meaning assigned to 'wilful,' 'wanton' or 'reckless,' according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." Prosser, Torts, 4th ed., § 34, p. 185.

To determine wanton negligence, the acts of a defendant must be considered as a whole and although each of several acts standing alone might not exceed the bounds of ordinary negligence, yet taken together they may establish wanton negligence. Carley v. Meinke, 181 Neb. 648, 150 N.W.2d 256 (1967). Where the evidence discloses several acts of negligence, whether gross or wanton negligence is established is a matter for the jury. Brown v. Riner (Wyo.), 500 P.2d 524 (1972).

At about 1:00 p. m. on November 29, 1966, on a clear day, William Lueck, a 30-year-old resident of Willcox, Arizona, was fatally injured when the truck he was driving was struck by a Southern Pacific Transportation Company train at the Maley Street crossing within the corporate limits of Willcox, Arizona. Shortly before the deceased's truck entered upon the railroad crossing, the Southern Pacific's Blue Streak Manifest passed over the Maley Street crossing on the main line traveling westward. The Blue Streak Manifest was followed one and one-half to two minutes later by a work train. This latter train struck the deceased's truck.

Maley Street is a four-lane, north-south, paved highway with cement curbs, two lanes for northbound and two for southbound traffic. Prior to the accident, deceased was driving his truck south on Maley Street loaded with 12 to 14 tons of sand and gravel at a speed of about five miles per hour. He was a resident of Willcox, familiar with the railroad crossing having used it almost daily. The crossing consisted of four tracks. It averaged a daily traffic count of 2700 to 3000 motor vehicles and an average of 32 trains in a 24-hour period. The deceased was struck on the main line, the second track from north to south. (See sketch adapted from defendant's Exhibit N.)

564

A  Direction of travel of deceased; south.
B  Direction of travel of BSM and work train; west.
C  Direction of travel of freight train awaiting
   clearance of main line.

The railroad crossing where the accident occurred was protected by all the usual railroad crossing signs. In addition to the standard crossbucks, highway and pavement markings, there were four flashing red lights, eight inches in diameter with warning bells located at the sides of the crossing and two flashing red lights on an overhead cantilever extending over the center of the inside traffic lane with warning bells and a square sign warning "stop on red signal." At the time of the accident, since changed, the flashing lights and warning bells were activated by trains on the switching tracks.

It is plaintiff's position that even if the warning bells and the flashing red lights had not momentarily stopped between the passage of the two trains, all the facts and circumstances then existing at the crossing tended to confuse and mislead the deceased. She points to 25 inferences which she derives from the evidence to support her claim of wanton negligence. We think, however, it is unnecessary to labor the issue to that extent. Taken in a light most favorable to upholding the jury's verdict, the facts hereinafter recited are more than sufficient to support a finding of both wanton and willful negligence.

## THE EVIDENCE OF WANTON AND WILLFUL NEGLIGENCE BY THE SOUTHERN PACIFIC TRANSPORTATION COMPANY

Two hundred feet north of the point of impact is the intersection of a road parallel to the tracks, called Railroad Street, and Maley Street. From Railroad Street almost to the tracks the vision of an approaching motorist is obstructed both to the right and left as the crossing is approached from the north. On the left of a motorist is a city park in which trees obstruct the view to the east. On the right between Railroad Street and the tracks is a depot. The depot obstructs the view of a motorist looking toward the railroad siding and switching area on the right, to the west.

To the right at a distance of approximately one-fourth of a mile was a freight train at rest, waiting for the main line to clear.

The work train which struck the deceased consisted of an engine and caboose. The engine was running backward, pulling the caboose although it could have been turned at Bowie, a town approximately 24 miles to the east of Willcox. It was the conductor's responsibility and decision as to how the engine should be run. Because the engine was running in a backing position, the engineer had to rely on the fireman for information as to conditions on the north side of the railroad right of way.

The fireman saw the deceased's truck twenty seconds before the collision. He warned the engineer five times that he didn't think the deceased was going to stop, testifying:

"Q. Sir, how many times between the time you first told him, Mr. Rhoades [the engineer], you didn't think he was going to stop, and the time you actually told him to big-hole it; how many other times did you indicate that you didn't think he was going to stop?

A. To my knowledge, twice and maybe three times.

Q. So you indicated to him two to three times in addition to the first one that you didn't think Bill was going to stop; is that correct, sir?

A. To my knowledge, yes.

Q. And then at approximately the fifth time, you said he is not going to stop, big-hole it?

A. (Affirmative nod)

Q. And he did; is that correct, sir?

A. Yes, sir."

No effort was made by either the fireman, who also had emergency brake controls at the position where he sat, or the engineer to reduce the speed of the train until just before the impact. After striking the deceased's truck, the work train traveled between 2300 and 2500 feet before it came to a stop.

Because the engine of the work train was running backward, the oscillating white light on the front of the engine was pointing to the rear and was turned off. The oscillating light is a warning light designed to give a different and greater warning than the usual headlight. The single non-oscillating backing light at the rear of the engine was on.

The work train left Bowie going west from eight to ten minutes behind the Southern Pacific's Blue Streak Manifest which was traveling at the average speed of 60 miles per hour. At Willcox the work train had gained on the Blue Streak Manifest until it was between one and one-half to two minutes behind. The engineer is required by the Southern Pacific Company to proceed at maximum authorized speed, which was at the crossing 60 miles per hour. No allowance is made for lack of visibility.

A brakeman, who was sitting in the caboose, testified that the railroad's system of block lights was on yellow. When the block lights are on yellow, the railroad's safety rules require a train to proceed at a speed not in excess of 40 miles per hour. The accident report filed by the engineer the day of the accident showed that the work train was traveling at a speed of 52 miles per hour. The plaintiff's reconstruction expert testified that in his opinion, because of the distance required to bring the work train to a stop and other factors, it was traveling at a speed of up to 70 miles per hour. If the work train had been traveling at 40 miles per hour, according to the same expert, there would have been no collision.

*Prior to 1965, a year before the accident,* the speed limit for trains passing through the City of Willcox was fixed by the City Council at 30 miles per hour. Four years prior, the defendant railroad commenced negotiations with the City which culminated about a year before the accident with the Council raising the speed limit to 60 miles per hour *on assurances from the railroad of the safety of the crossing.* There had been four accidents at this crossing within the period from January 1963 to April 1966.

The jury could conclude from the foregoing stated facts that the Southern Pacific Transportation Company was negligent in at least these particulars:

1. Since the speed limit for trains was fixed at 60 miles per hour through the City of Willcox and since the work train was running at the estimated speed of as high as 70 miles per hour, it could have concluded that the work train was being operated in violation of the speed law and that such constituted negligence per se.

2. Since by statute A.R.S. § 40–855 it is a criminal offense for an agent or servant of a railroad company to be guilty of any violation or omission of duty whereby human life or safety is endangered and by the company's rules, Rules 505, et seq., when an automatic block signal displays yellow a train must move at a speed not to exceed 40 miles per hour, the jury could conclude from the engineer's report alone that the work train was in violation of Arizona statute § 40–855 in that it was being operated in violation of law and that this constituted negligence per se.

3. Since by Rule 17–D of the company's rules and regulations the oscillating white light on an engine " * * * must be operated approaching road crossings at grade both day and night under all conditions" and the engine was running backward so that the oscillating white light was not visible to the front, and was, in fact, turned off, and the engine could have been turned at Bowie, the jury could believe that the failure to run the engine in the forward position endangered the lives of persons who might expect a through train moving on the main line at a high rate of speed to show the oscillating warning light. This violation of the company's safety rules is a violation of law and was negligence per se.

As to these three points, A.R.S. § 40–423 is applicable. Subsection A thereof provides:

"If any public service corporation does or permits to be done anything forbidden

or declared to be unlawful, or omits to do anything required to be done, by the constitution or laws of the state, or by orders of the commission, the corporation is liable to the persons affected thereby for all loss, damages or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may also award exemplary damages."

■ 4. Since in traveling backward, the engineer had to look from the side window rather than through the front window and his view forward and to his right was impaired by the long end of the engine, the jury could conclude that this could result in the inability to control the train in an emergency and was a contributing cause to this accident. As the court said in Lester v. Atchison, Topeka and Santa Fe Railway Co., 275 F.2d 42, 45 (10th Cir. 1960):

"If the jury should find that the choice of conduct of the train crew in running the train backward, knowing that the control and safety of the operation of the short and heavy train was thereby greatly impaired was wrongful to such an extent as to evince a reckless disregard for the rights of others, we believe a finding of gross negligence permissible under New Mexico law."

■ 5. Since the fireman saw the deceased approaching the crossing approximately twenty seconds before the brakes were applied and told the engineer five times that he didn't think the deceased was going to stop, the jury could conclude wanton negligence from the deliberate maintenance of speed in disregard of observed danger. Western Constructors, Inc. v. Southern Pacific Company, 381 F.2d 573 (9th Cir. 1967).

Two further points should be made. They require enlargement on the facts related to this point.

6. Theodore H. Kruttschnitt, then Public Projects Engineer of Southern Pacific Company, testified concerning certain fac-

tors from which a conclusion could be drawn as to when a crossing is more than ordinarily dangerous:

"Q. Would you consider the location, say, within a quarter mile area of known switching operations and sidings is a factor that should be considered?

A. Yes * * *.

* * * * * *

Q. That kind of goes to the area of driver confusion or driver distraction, does it not, sir? The possibility that a driver may misinterpret signals as to whether or not another train is approaching on the main track or whether or not the signals may be activated by operations in a switching or siding area?

A. Yes."

He also testified:

"My experience as a commutor taught me that many of our very sad accidents were what I call the two-train type where a motorist will wait for a train coming in one direction which he sees and as soon as that train passes he starts up across the railroad in spite of the fact that the flashing lights are still working and gets hit by an unseen train going in the other direction on the other track."

■ The jury could conclude that Kruttschnitt's observations as to driver confusion were also true when one train follows closely behind another and that consequently the Maley Street crossing presented an unreasonable risk of bodily harm to others because of a high degree of probability that such harm would occur when the circumstances combined to confuse or mislead a motorist.

7. It is plaintiff's position that the Southern Pacific Transportation Company was in possession of information which would require that automatic gates be installed at the Maley Street crossing in order to adequately protect the public, but either through gross carelessness or deliberation the information was withheld from the City Council of Willcox at the time the de-

fendant requested the Council to raise the speed limit from 30 to 60 miles per hour and, further, that this information was withheld from its division employees who were charged with the responsibility of evaluating the crossing and from the interested Arizona agencies.

The plaintiff's case of willful negligence is based upon these facts. Both Kruttschnitt, now Assistant to the Chief Engineer, and Frank Lathrop, Public Projects Engineer for Southern Pacific Company whose area covers California, Arizona and New Mexico, testified to a 24-year study done by the defendant company, completed in 1961 under the supervision of Kruttschnitt, which revealed among other things that crossings protected by flashing red lights, including cantilevers, have more incidents of accidents than those protected by the customary crossbucks and highway markings. It also showed that automatic crossing gates reduce fatal accidents over any other type of protective device, including a crossing watchman, by 90%.

Kruttschnitt also had knowledge of another study prepared by the California Public Utilities Commission which covered 168 crossings in California from the period of July 1, 1954 through July 30, 1964, conducted in basically the same manner as Kruttschnitt's study. The California Public Utilities Commission study concluded among other things:

> "Stated another way it appears that if automatic crossing gates had not been installed at these 113 points there would be approximately 52 more accidents, ten more deaths, and 25 more injured persons at this group of crossings in each calendar year as shown in Line 5 of Table 3.
>
> In other words if the gates installed during the ten-year test period were in operation during the entire ten years there would have been 271 fewer accidents, 50 fewer fatalities and 131 fewer injuries."

Neither the Kruttschnitt study nor the California Public Utilities Commission study was known to the employees of the Tucson Division of the Southern Pacific who were charged with the responsibility of evaluating crossings and recommending safety devices.

R. O. Coltrin, Superintendent of the Tucson Division, charged with the ultimate evaluation of protective devices and recommendations for improvement, testified that he was not aware of the Kruttschnitt study.

Deryl B. Zumwalt, Division Engineer for the Tucson Division, delegated the evaluation and recommendation for improvement to Assistant Engineer Cornelius Sullivan. Zumwalt's testimony was contradictory. He testified in this case that he did know of the Kruttschnitt study, but was impeached by a showing that he had testified in a case in Maricopa County, Arizona in 1969 that he never heard of any such study. He did acknowledge that he had not personally seen a copy of the study.

Assistant Division Engineer Cornelius Sullivan had never seen the Kruttschnitt study until November 1969 and was not aware of its existence until that time. Sullivan also testified that if he had been aware of the conclusions of the study he probably would have recommended gates at the Maley Street crossing in 1963.

"Q. * * *

Sir, with the knowledge of that study and the comparison of fixed signs as compared to automatic signals and the fact that the study indicated you could expect more accidents and more combined injuries and fatalities at automatic signals than fixed signs would that have had any bearing on your recommendations to the City of Willcox from '63 through '66 if you had had that information made available to you?

A. It probably would have, yes.

Q. Thank you, sir. And what you are saying is, with that kind of information you probably would have recommended gates; right, sir?

A. Yes."

Other interested persons were never informed of the Kruttschnitt study. William J. Whisnant, Director of the Tariff and Rate Division of the Arizona Corporation Commission, testified that he had never seen or heard of the Kruttschnitt study. So far as he was aware it had never been furnished to the Corporation Commission. Edward P. Brown, Supervisor of the Utility Railroad Engineering Division of the Arizona Highway Commission, testified that he had never seen a study of the Southern Pacific Company concerning the effectiveness of grade crossing warning devices.

Kenneth P. Hamblin, an employee of the Arizona Highway Department since 1959, who had been Supervisor of the Traffic Study Section for three years and a field study supervisor for an additional three years, testified to a study he had made of the Maley Street crossing in May of 1966, six months before decedent's death, at the request of the City Manager of Willcox. He concluded that there should be crossing gates installed at Maley Street, testifying:

"It is a combination of conditions that existed at that time: One being that it was an urban crossing, a multi-lane highway, the daily vehicle count and a limited view of approaching trains; the fact that there were four tracks, switching operations, thirty-two trains daily, sixty mile per hour trains and the accident experience that had been there in the last couple of years, the couple of years prior to the study."

That the Arizona Highway Department was studying the Maley Street crossing was conveyed to the Southern Pacific Company at least as early as April 19, 1966. This conclusion was reported to the City Manager of Willcox in July of 1966.

Lathrop listed the factors to be considered in determining whether gates should be installed at crossings. They were:

1. Motor vehicle speed.
2. Visibility of the motor vehicle driver as he approaches the crossing.
3. Visibility of the train crew.
4. Parallel streets relatively close to the crossing.
5. Intersections near the crossing.
6. Speed of trains.
7. Switching activity in the vicinity of the crossing which periodically activates the signals at the crossing.
8. Number of trains per day.
9. The motor vehicle traffic count.
10. The accident history of the crossing.
11. The grade of approach.

Lathrop's testimony on cross-examination was to the effect that all these factors were present at the Maley Street crossing except the grade approach. He also was examined extensively on his recommendation that gates be installed at certain California crossings based on the existence of some, but not all, of the hazardous factors which he listed as existing at the Maley Street crossing.

Kruttschnitt listed three additional factors which should be taken into consideration:

1. Weather conditions.
2. Width of the highway; whether it was of two, four or six lanes, and
3. Whether the crossing was a single or multi-track crossing.

Prince Pierson, City Manager of the City of Willcox at the time of the collision, testified that the City Council would have followed the recommendations of the Southern Pacific Company with regard to safety and would have directed the installation of gates at any time that the Southern Pacific had recommended it. He also testified that he was never told of the Kruttschnitt study, but had he known of the conclusions of the study he would have recommended the installation of gates to the City Council.

The plaintiff submitted certain interrogatories to the Southern Pacific Transporta-

tion Company which included in part the following question:

"Are you aware of any studies, statistics, or research projects which have been performed by you or other organizations concerning the effectiveness, or lack thereof, of crossing gates in reducing crossing accidents and/or injuries?"

Thereafter, when plaintiff felt that the answer was not responsive to the question, she re-submitted the same interrogatory, which the attorneys for the Southern Pacific Transportation Company, under oath, answered, "No."

■ From the foregoing, the jury could conclude that the Southern Pacific Transportation Company was either willfully or wantonly negligent in failing to inform its agents and employees in its Arizona Division or other interested persons in Arizona of facts which, at the time of increasing the speed limit in 1965 from 30 to 60 miles per hour through the City of Willcox, would have required the installation of automatic crossing gates at Maley Street to ensure the safety of the public.

### DAMAGES

This brings us to the questions raised by appellant as to the claimed excessiveness of the damages awarded by the jury. In our most recent case on punitive damages, where actual damages of $3,600 actual damages and $15,000 exemplary or punitive damages was awarded, we said:

"Punitive damages are allowed on grounds of public policy, Downs v. Sulphur Springs Valley Electric Coop., 80 Ariz. 286, 297 P.2d 339 (1956), and are based on aggravated, wanton, reckless or maliciously intentional wrongdoing. Lutfy v. Roper, 57 Ariz. 495, 115 P.2d 161 (1941). Such damages are not to be awarded to compensate a plaintiff for the loss sustained, but, rather, are awarded for the avowed purpose of punishing the wrongdoer for his intentional misconduct and they also act as a deterrent to further wrongdoing. Nielson v. Flashberg, supra [101 Ariz. 335, 419 P.

2d 514]; Restatement of the Law, Torts, § 908 Comment a." Acheson v. Shafter, 107 Ariz. 576, 578, 490 P.2d 832, 834 (1971)

and we also said:

"In Arizona, the law is well settled that the amount of an award for damages is a question peculiarly within the province of the jury and such award will not be disturbed on appeal except for the most cogent of reasons, i. e., the verdict is so exorbitant as to indicate passion, prejudice, mistake or a complete disregard of the evidence and instructions of the court. Meyer v. Ricklick, 99 Ariz. 355, 409 P.2d 280 (1965); City of Yuma v. Evans, 85 Ariz. 229, 336 P.2d 135 (1959). We have, in the past, held that punitive damages will be upheld unless the verdict is 'so manifestly unfair, unreasonable and outrageous as to shock the conscience of the Court.' Young Candy & Tobacco Company v. Montoya, 91 Ariz. 363, at 370, 372 P.2d 703 at 707 (1962)." 107 Ariz. at 579, 490 P.2d at 835.

■ The purpose of punitive damages is to punish a wrongdoer for his wrongdoing. The wealth or financial status of the wrongdoer is therefore relevant and may be known to the jury so that it may impose an appropriate punishment. Acheson v. Shafter, supra; Nielson v. Flashberg, 101 Ariz. 335, 419 P.2d 514 (1966). As to this, the plaintiff's evidence established that the net assets of defendant were $1,712,727,000 for the year 1972 and that its annual income after expenses but before income taxes was $165,555,000.

■ Applying the foregoing to the evidence in this case, it is apparent that if the jury concluded that the Southern Pacific Transportation Company had either deliberately or through wanton or gross negligence withheld from its employees facts which would have required and resulted in the upgrading of the Maley Street crossing by the installation of crossing gates, the punitive damages awarded were not so

manifestly unfair, unreasonable and outrageous as to shock the conscience.

In examining defendant's argument that the award of actual damages by the jury is excessive, we consider that the decision of the United States Supreme Court in Grunenthal v. Long Island Railroad Company, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968), has particular significance. There, a jury in the Southern District of New York awarded actual damages in the sum of $305,000. On appeal, the Second Circuit ordered a remittitur of $105,000. The Supreme Court observed that the discussion by the Court of Appeals concerning the amount of damages was limited to the bald statement that it could not in any rational manner consistent with the evidence arrive at a sum greater than $200,000. The Supreme Court in reinstating the jury's verdict held that if damages are ordered reduced by an appellate court an appraisal of the evidence must be made which discloses the excessive nature thereof.

The defendant does not attempt to evaluate the evidence other than pointing to the deceased's income tax returns, which showed that in the five years preceding his death he had taxable income in his best year of $5,834.37, and an assumed economic loss to plaintiff of $691,769 reduced to present value of $281,863. Defendant argues that $281,863 would not provide a basis for a two million dollars compensatory award. The figure of $281,863 is taken from the testimony of Edward Heller, by profession an economist with a specialty in the field of manpower economy, resource economics. He testified that there were studies available as to future earning capacity of an individual as it relates to inflation and the purchasing power of the dollar, and that by means of these he was able to project what a person of a given education and training could reasonably earn in the future.

Heller made a study or evaluation of the earning capacity of deceased. In arriving at his conclusions, among the factors considered were that the deceased was a high school graduate with vocational training in welding and had operated a welding shop from his high school days until 1961 when he started the business known as Lueck's Construction Materials. He testified:

"A. * * * In terms of surveying the job market, Mr. Lueck, as a—what we would call a heavy-duty welder, heavy-duty concrete—I can't now remember the exact title now, but it's a—concrete journeyman; a person who could pour, finish, do the molding work necessary with heavy concrete construction—could have expected to earn around the same $800 per month at the—in 1966.

* * * * * *

Q. Would I be correct, then, the fringe benefits, plus the 800 a month, are the figures you used to make your ultimate conclusion?

A. Yes. Plus the cost of replacing his services, less his personal consumption.

Q. * * * What I was driving at, if Mr. Lueck had been in the job market, rather than in a self-employed situation, would the additional fringe benefits he would expect to have mean that he would have had a greater earning capacity in a job market, as opposed to being self-employed?

A. Very definitely.

Q. And yet you used the lesser end of those two figures?

A. Yes."

It is therefore apparent that the deceased's earning capacity over his life expectancy of 41 years was predicated on the assumption that Lueck could be employed as an expert welder or journeyman concrete worker.

The jury was not, however, compelled to accept as conclusive the statistical approach used by Heller. Other evidence disclosed that deceased was a well-liked, industrious, hard-working male of the age of 30 years, that the business of Lueck's Construction Materials involved manufacturing and selling ready-mixed concrete for buildings and irrigation ditches; that

in addition deceased operated a gravel pit and sold gravel; that in the course of the five years since he started the business, he had acquired by the time of his death three mixers, three dump trucks, three loaders, a rock crusher, a steam shovel and blade, and a batching plant.

The Iowa Court in Nicoll v. Sweet, 163 Iowa 683, 144 N.W. 615 (1913) has probably best summarized the difficulties in the assessment of damages for wrongful death:

"It is correct to say, as does the appellant, that the only true measure of recovery for the death of an individual is the value of his life to his estate, had he not come to such untimely end. It is hardly too much to say that this rule is vague, uncertain, and speculative, if not conjectural, but it is the best which judicial wisdom and experience has yet been able to formulate. No evidence is possible of the time which deceased would have lived but for the injury complained of. Had he avoided this injury, death may have met him the next day, week, or year in some other form. In business he might have become a phenomenal success and accumulated millions, or he might have lived to old age and died a pauper. From a man of good habits and prudence and industry, he might have become a spendthrift or a tramp, or if a man of dissolute habits he might have reformed into an efficient and prosperous citizen. But the demands of justice will not tolerate the idea that human life may be extinguished by the tort of another without the wrongdoer being held to answer therefor in damages, and the rule we have stated is the one which has been devised for this purpose. The principle which underlies it is of unquestionable soundness, but the difficulty which besets its practical application is in the fact that it calls for an estimate or conclusion which must be arrived at by a balancing of mere probabilities and possibilities which we deduce by way of inference from the age, character, habits,

condition, education, employment, surroundings, and apparent capacity of the deceased. Fairness to the beneficiaries of the estate on the one hand and of the defendant on the other require that the jury be put in possession of all the facts having the slightest legitimate bearing upon this intricate problem." 163 Iowa at 687–688, 144 N.W. 615 at 617.

Plaintiff points to the recent Florida case of Compania Dominicana de Aviacion v. Knapp, 251 So.2d 18 (Fla.App.1971), in which a verdict for $1,800,000 was upheld in favor of a father and mother for the wrongful death of their 15-year-old son. The son was a graduate of a junior high school about to enter high school, a good student, friendly, polite, warm, active, religious, and at the time of his death was working in his father's paint and body shop. There was also testimony as to the grief and anguish of the parents. The Florida court noted that the amount of the verdict was determined by a carefully chosen jury after a lengthy trial before an experienced and knowledgeable judge with the assistance of expert counsel. It said in concluding that the verdict and judgment were supported in law and fact: "No one doubts that the verdict is large. No one doubts the enduring pain which the parents have suffered."

While it is true the deceased's net earnings for taxes were relatively small, we think it can be said that the jury could make its own evaluation of the earning capacity of the deceased over his lifetime from the establishment of a successful, going business at the age of thirty, which evaluation would be much greater than the purely statistical approach used by Heller.

■ The jury could consider other matters for which the members of deceased's family should be compensated: For the wife, her loss of love, affection, companionship, consortium, and her personal anguish, sorrow, suffering and pain and shock which resulted from her husband's death. For the six-year-old son, it was shown that following the accident he

commenced to draw pictures of train wrecks, that he refused to go to school and developed head and stomach aches and that these problems were determined to have been caused by the emotional loss of his father, and that it was three years before he overcame them. For the 18-month-old child, it was shown that after the accident he would not leave the presence of his mother even to be held by his grandparents and if his mother left he would scream until she returned, and he refused to sleep in his own bed until some six months after the death of his father. The jury could also consider what the sons were to be compensated for the loss of love, affection, comfort, guidance and companionship which they would have received from their father.

The defendant has not questioned the instructions on the elements of damages which were submitted by the trial court to the jury and no interrogatories or separate forms of verdicts were requested from the jury segregating the damages suffered by each survivor. There is accordingly now no way of determining what the jury believed the plaintiffs individually suffered. We are not convinced the verdict is so outrageously excessive that it compels the conclusion that it must have been based on passion and prejudice.

## OTHER ASSERTED ERRORS

■ The defendant urged that the instructions on wanton negligence were erroneous and prejudicial and points to plaintiff's instructions 8, 26(a) and 34. In those instructions, the terms gross negligence, wanton negligence, and willful misconduct are used. It is argued that the jury could thereby infer that there were three separate categories of negligence under which a verdict could be returned against the defendant.

An examination of the objections to plaintiff's instructions 8, 26(a) and 34 reveals that no objection was made on this basis. Rule 51(a), Rules of Civil Procedure, 16 A.R.S., reads in its pertinent part:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

In Purcell v. Zimbelman, 18 Ariz.App. 75, 500 P.2d 335 (1972), the court commented on Rule 51(a) to this effect:

"The purpose of Rule 51(a), supra, is to apprise both the trial court and the party offering the instruction of the exact nature of the objection so that the court can intelligently rule thereon, eliminate objectionable matter, and word the instruction in a manner which might be agreeable to all parties." 18 Ariz.App. at 91, 500 P.2d at 351.

■ Defendant urges that the court erred in failing to give its requested instruction No. 6. Defendant's requested No. 6 was to the effect that an engineer or other employee in charge of a train has in the exercise of ordinary care the right to presume that the vehicle a person is riding in over a crossing is under control and in good repair. While as an abstract proposition the instruction was correct, it was properly refused because it suggested to the jury that there was an issue whether deceased was in control of his truck and whether it was in good repair. There was no evidence that deceased did not have his truck under control or that it was not in good repair. Hence, there was no issue to be resolved by the use of a presumption.

Defendant's requested instruction No. 12 is afflicted with the same vice.

The defendant urges that the trial court erred in refusing to give its requested instruction No. 7(B). The requested instruction reads:

"If you find the plaintiff's contributory negligence was gross or wanton, then the plaintiff may not recover, regardless of whether the defendant was grossly negligent."

While the Arizona courts have never ruled on the abstract proposition that gross or wanton contributory negligence on the part of a plaintiff is a defense to gross or wanton contributory negligence on the part of the defendant, we have many times held that where there are no Arizona decisions clearly on point we will follow the Restatement of Law, Torts.

The Restatement of Law, Torts, published in 1939, did not recognize the doctrine; however, the Restatement of Law, Second, published in 1965, by § 503 has adopted the principle as governing. Section 503 provides:

"(1) A plaintiff's contributory negligence does not bar recovery for harm caused by the defendant's reckless disregard for the plaintiff's safety.

* * * * * *

(3) A plaintiff whose conduct is in reckless disregard of his own safety is barred from recovery against a defendant whose reckless disregard of the plaintiff's safety is a legal cause of the plaintiff's harm."

Comment c thereto reads:

"In general, the effect of the plaintiff's reckless disregard of his own safety is the same as that of his ordinary contributory negligence. The exception to this rule, stated in Subsection (3), is that where the plaintiff's conduct is itself in reckless disregard of his own safety, it bars his recovery not only from a defendant who has merely been negligent, but also from one who has acted in reckless disregard of the plaintiff's safety. The greater fault in the one case is balanced against the greater fault in the other."

■ We have concluded, consistent with our former decisions, and we hold, that a plaintiff's wanton contributory negligence may be balanced against the wanton negligence of a defendant so as to bar a recovery in Arizona. We are of the opinion that as an abstract proposition a jury could find that a person who drives upon a railroad crossing against the flash-ing red lights was grossly or wantonly negligent.

■ However, the defendant's proffered instruction is plainly deficient. First, it assumes that the plaintiff was contributorily negligent. Second, it fails to advise the jury that this asserted gross or wanton contributory negligence must be the proximate cause of the accident and injuries which the deceased suffered; and, third, by the wording "the plaintiff may not recover regardless" it strongly tends to suggest that the jury must not return a verdict in favor of the plaintiff. This is contrary to our express holdings in Heimke v. Munoz, 106 Ariz. 26, 470 P.2d 107 (1970) and Layton v. Rocha, 90 Ariz. 369, 368 P.2d 444 (1962).

In view of our conclusion that the instruction was fatally deficient, we do not feel called upon to pass upon the plaintiff's argument that A.R.S. § 40–423, quoted supra, imposes strict liability upon a public service corporation where it willfully omits to do an act required by the laws of this State. See, e. g., McCallie v. N. Y. Central Rd., 23 Ohio App.2d 152, 261 N.E.2d 179 (1969).

■ The defendant complains of the order of the Superior Court changing the venue of the trial action from Cochise County to Pima County.

By A.R.S. § 12–406(A), if either party to a civil action pending in the Superior Court files an affidavit alleging any of the grounds specified in subsection (B), the venue may be changed to the most convenient adjoining county. Section (B) of § 12–406 provides as one of the grounds:

"That the convenience of witnesses and the ends of justice would be promoted by the change."

The plaintiff filed an affidavit which set forth that the plaintiff and her two minor children now resided in Tucson, Pima County, Arizona; that counsel for both plaintiff and defendant resided in Tucson; that the personnel of defendant and members of the train crew and employee witnesses of the Tucson division of the de-

fendant were all residents of Tucson; that facilities, both court and motel, were better in Tucson than in Bisbee; and that the employees of the defendant could obtain direct flight connections from Los Angeles and San Francisco to Tucson.

Defendant in its unverified opposition to the motion for change of venue urged:

1. That the plaintiff's motion was untimely;

2. That many of its witnesses resided in Cochise County;

3. That facilities and other accomodations in the Bisbee area were adequate; and

4. That the residents of the City of Willcox, from which several of their witnesses were expected to come "would be safer if they were not exposed to the hazards of freeway driving and the metropolitan traffic of the City of Tucson."

Defendant argues in this Court that the prejudice to the defendant is obvious in three particulars:

"1. The Defendant has been effectively deprived of its right to file a request for change of judge; and then

2. It was forced to try the case in a county in which it had consistently received the most venomous publicity from the newspapers and television stations; and

3. Cochise County jurors, familiar with the crossing, would have realized Mr. Lueck's negligence."

It is not obvious to the members of this Court that the defendant was effectively deprived of the right to request a change of judge, or that it was forced to try the case in a county in which it had consistently received the most venemous publicity and that Cochise County jurors would have been so familiar with the crossing as to have realized deceased's negligence. Nor do we think the court abused its discretion in light of the fact that the cost of the trial to the litigants would be substantially reduced.

We now come to the final matter requiring our consideration.

On February 18, 1975, defendant filed in this Court a motion to supplement the record. The motion was based on "newly discovered, relevant evidence" as set forth in attached affidavits and was filed assertedly pursuant to the authority of Rule 75(h) of the Rules of Civil Procedure, 16 A.R.S.

We have previously expressly held under language the same as Rule 75(h), *see* § 21–1826, A.C.A.1939, that the rule does not authorize the supplementation of the record with evidence which might have been relevant to the issues tried in the court below. Hughes v. Young, 58 Ariz. 349, 120 P.2d 396 (1941).

Hughes v. Young follows the general rule of wide application that an appellate court can determine a cause only upon the record of the court below. We said, for example, in Potter v. Home Owners' Loan Corporation, 50 Ariz. 285, 72 P.2d 429 (1937):

"Counsel for both plaintiff and defendant have, in their briefs, made many statements as to what did happen, and what would have happened if the situation had been different. We, of course, cannot consider such statements, being confined in our determination of the case to what is shown by the record and the necessary and reasonable inference to be drawn therefrom only." 50 Ariz. at 289, 72 P.2d at 431.

The Arizona Supreme Court has original jurisdiction in certain common law writs, Article 6, § 5, Constitution of Arizona. This case, however, invokes our appellate jurisdiction. A motion for new trial filed in this Court is not addressed to our appellate jurisdiction. Its consideration does not call for review of any judgment or order of the trial court. It is in the nature of an original proceeding which this Court does not have the power to en-

tertain. Rodriquez v. Williams, 104 Ariz. 280, 451 P.2d 609 (1969); Yerger v. Bross, 68 Ariz. 104, 201 P.2d 121 (1948). Nor will we remand a case for a new trial based upon newly discovered evidence, since such a motion is not properly addressed to this Court. State v. Davis, 104 Ariz. 142, 449 P.2d 607 (1969).

Indeed, it has been held under a similar constitutional provision to Arizona's that even the Legislature cannot authorize the Supreme Court to receive evidence since it contravenes the constitutional provision that the Court has appellate jurisdiction.

"After Schmidt v. Equitable Life Assurance Society, 376 Ill. 183, 33 N.E.2d 485, 136 A.L.R. 1036, had been docketed in this court, one of the parties undertook to supply evidence to correct a material defect in the record by the introduction of affidavits on motion. It was held that subparagraph (d) [Sec. 92 of the Illinois Civil Practice Act], insofar as it undertook to authorize the introduction of evidence in a court of review that had not been made a part of the record when the cause was pending in the trial court, was unconstitutional. If the affidavits should be considered as evidence, it would be assuming original jurisdiction in reference to such affidavits, an act which the constitution forbids in this kind of case." Atkins v. Atkins, 393 Ill. 202, 206, 65 N.E.2d 801, 803 (1946).

By the Constitution of Arizona, Article 6, § 14, the Superior Court has original jurisdiction of cases and proceedings not vested by law in another court.

The facts presented by the defendant's affidavit and the plaintiff's objection to consideration of the matters contained therein illustrate the practical problem inherent in an appellate court's consideration of matters extraneous to the record.

It is deposed by the attorneys for the Southern Pacific Transportation Company that the plaintiff's reconstruction expert, A. W. Dickinson, did not hold B.A. and M.A. degrees from Cambridge University in England and that he had not worked for certain companies in the United States or held certain positions, as, for example, a member of the von Braun aerospace team, as he testified. The plaintiff in her objection to the supplementation of the record asserts that due diligence on the part of the defendant would have disclosed the matters contained in its motion prior to the trial of this case in August of 1973, that defendant did not choose to contradict his testimony by other experts nor is it now contended that his opinions and conclusions are false.

Plaintiff submits a letter from one Vaughn P. Adams, a consulting engineer and Assistant Professor of Industrial Design at Arizona State University, to the effect that he has reviewed the testimony of A. W. Dickinson and is of the opinion that the methods employed by Dickinson to determine the velocity of the locomotive and caboose were correct and that there was no significant error either in the methods used or the arithmetic results.

By Article 6, § 5, subsec. 5, Constitution of Arizona, this Court is empowered to "make rules relative to all procedural matters in any court." Since it is palpably impossible for the members of this Court to determine whether the asserted perjury was such as to probably affect the outcome upon a retrial, see 38 A.L.R.3d 812, Anno: Perjury or Willfully False Testimony of Expert Witness as Basis for New Trial on Grounds of Newly Discovered Evidence, we have decided to treat defendant's motion as a timely motion for a new trial under Rule 60(c), Rules of Civil Procedure, 16 A.R.S.

We direct that this matter be remanded to the Superior Court of Cochise County and the Honorable Lloyd Helm, trial judge thereof, who, having had the opportunity to see and hear the witness, has the necessary feel for the case.

The Superior Court shall determine, pursuant to Rule 60(c), whether the asserted newly discovered evidence could not have been discovered by due diligence in time to move for a new trial under Rule 59(d), 16 A.R.S., and whether it is of such a character as to give reasonable assurance that it will work a different result upon retrial.

Upon the determination thereof, in order to obviate the necessity of another appeal, the Superior Court shall advise this Court of its ruling. Either party will thereafter have ten days within which to file objections in this Court and the opposing party will have ten days within which to respond. Whereupon this Court will either affirm the judgment or reverse with an order directing a new trial, as it deems fit in the premise.

CAMERON, C. J., and LOCKWOOD, HAYS and HOLOHAN, JJ., concur.