[Civ. No. 33126. Second Dist., Div. Two. Apr. 24, 1969.]

FREDRIC OLEA, a Minor, etc., et al., Plaintiffs and Respondents, v. SOUTHERN PACIFIC COMPANY, Defendant and Appellant.

OLGA OLEA et al., Plaintiffs and Respondents, v. SOUTHERN PACIFIC COMPANY, Defendant and Appellant.

(Consolidated Appeals)

Randolph Karr, William E. Still and Norman T. Ollestad for Defendant and Appellant.

Magana, Olney, Levy & Cathcart, Raoul D. Magana, Jack Tenner and James H. Davis for Plaintiffs and Respondents.

HERNDON, Acting P. J.—This appeal is taken by Southern Pacific Company from the judgment entered upon the verdicts of the jury in these two consolidated actions for wrongful death. These actions arose out of the railroad crossing accident in which Fredric and Ronald Olea were killed. The assignments of error to which appellant has devoted substantial argument are presented under two headings phrased as follows: (1) "The issue of wilful misconduct should not have been submitted to the jury;" and (2) "There was no basis for instructing on the doctrine of imminent peril." We have concluded that the evidence presented to the jury was such as to justify and require the giving of the challenged instructions.

The fatal accident occurred at approximately 2 a.m. on February 16, 1964, at the Vineland Avenue crossing of appellant's tracks in the City of Industry. The automobile in which decedents were proceeding northbound on Vineland Avenue was struck by appellant's eastbound train. At this crossing the most southerly track is a control siding, or passing track; the second track is the main line; the two most northerly tracks are industrial tracks. The crossing is protected only by "wigwag" signals. The two southerly tracks are designed and utilized to permit the passing of trains.

Approximately 5,440 motor vehicles cross these multiple tracks daily. Each day some 30 trains travelling at authorized speeds up to 70 miles per hour pass over this crossing on the main line track. Whenever the control track is used by one train to permit another to pass it on the main line, there is the danger that vehicles driving north on Vineland will proceed forward after the crontrol track is cleared and directly into the path of the oncoming main line train. During switching operations trains may be stopped on the control track for as much as an hour. The dangerous condition existing at this crossing is further aggravated because the grade approach is 4.8 percent on the ascent from the south, thus further impairing the vision of vehicular traffic. There had been three accidents at this crossing during the period November 1958 to October 1963 although, fortunately, none of these resulted in a fatality.

The expert testimony unanimously agreed that crossing gates were desirable at all multiple track crossings, and particularly those with a large amount of vehicular traffic. Such gates were not only recommended by the Public Utilities Commission but had been recommended at this particular crossing

by appellant's own safety engineers. Crossing gates tend to prevent automobiles from proceeding into the path of a second, unseen train, after a first has passed. Where installed they have reduced the fatalities by 90 percent. Appellant could have installed gates at any time at this particular crossing at a cost somewhat in excess of $20,000 and planned to do so at some indefinite future date.

At the time of the instant accident drivers of both northbound and southbound cars had been waiting for a slow moving switching train proceeding westerly on the control track to clear the intersection. When it had done so and come to a stop, the wigwag signals ceased operating, according to the testimony of Richard Amaya, the driver of the first southbound vehicle. Vehicular traffic then proceeded forward in each direction. When Amaya passed over the first of the northerly industrial tracks, he was able to see the train which was rapidly approaching the intersection eastbound on the main line. He stopped his car and futilely yelled and flashed his headlights in an effort to warn the northbound cars that were proceeding into the path of the oncoming train hidden from their view by the westbound train.

The first northbound car moved forward slowly until its driver apparently saw the eastbound train approaching at approximately 60 miles per hour. He first appeared to apply his brakes and then "gunned" forward, successfully crossing ahead of the train. The decedents were in the second northbound car. It, too, proceeded forward slowly behind the first car but was struck by the eastbound train with the resultant fatalities.

The evidence which we have summarized was entirely sufficient to justify the giving of the instruction on the issue of wilful and wanton misconduct. "Wilful misconduct means intentional wrongful conduct, done either with knowledge that serious injury to [another] probably will result or with a wanton and reckless disregard of the possible results; the [defendant's] entire course of conduct, . . . is to be considered; and the existence of wilful misconduct is essentially a question of fact. [Citation.] ' " [A]n intent to injure anyone is not a necessary ingredient of wilful misconduct. . . .' " [Citation.]" (*Reuther* v. *Viall,* 62 Cal.2d 470, 475 [42 Cal.Rptr. 456, 398 P.2d 792].)

In *Reuther,* our Supreme Court held that where a defendant automobile driver had taken her eyes off the road while trying to retrieve a hot cigarette lighter, the evidence was

sufficient to take the question of wilful misconduct to the jury. When we consider appellant's "entire course of conduct" in the instant case, the issue of wilful or wanton misconduct becomes, at least, a question of fact for the trier of fact.

 Citing *Levizon* v. *Harrison*, 198 Cal.App.2d 274, 281 [18 Cal.Rptr. 284], appellant contends that three essential elements must co-exist in order to bring negligent actions to the level of wilful and wanton misconduct, i.e., "1. Actual knowledge (or its equivalent) of the peril to be apprehended. 2. Actual knowledge (or its equivalent) that an injury will probably result. 3. Conscious failure to act."

We perceive no reason to quarrel with this contention since the evidence in the instant case is sufficient to support findings as matters of fact that appellant knew of the peril existing at this multiple crossing protected only by wigwag signals, knew or should have known that injury of the most serious nature would probably result from this peril, and nevertheless consciously failed to act. It is true, as appellant argues, that the three prior accidents at this crossing did not result in fatalities, but considering the inherently destructive nature of any automobile-train collision, these prior accidents could properly be regarded as warnings sufficient to bring home to appellant the seriousness of the peril and the urgency of the need for the installation of crossing gates in order to prevent foreseeable tragedies.

In addition to the evidence previously recited, there was the testimony of the rear brakeman of the westbound train that he knew a fast moving train was due to pass on the main line and yet that he failed to dismount from the caboose to prevent traffic from proceeding onto the tracks because "I didn't want to get left there." Further, if the westbound train had stopped within 100 feet of the intersection, as testified to by every witness other than its brakeman, such stopping would have been in violation of one of appellant's own safety rules.

Assuming, as we must, that the jury resolved all conflicting evidence in respondents' favor, there was substantial basis for a finding that the extremely dangerous conditions existent at the time of the instant accident were so obvious that any person of normal intelligence should have been aware of them. Our observations in *Pelletti* v. *Membrila*, 234 Cal.App.2d 606, 611 [44 Cal.Rptr. 588], are equally apposite here: "[I]f conduct is sufficiently lacking in consideration for the rights of others, reckless, heedless to an extreme, and indiffer-

ent to the consequences it may impose, then, regardless of the actual state of mind of the actor and his actual concern for the rights of others, we call it wilful misconduct, and apply to it the consequences and legal rules which we use in the field of intended torts. (*Levizon v. Harrison,* 198 Cal.App.2d 274, 279-281 [18 Cal.Rptr. 284].) The rule is expressed in Restatement of Torts, section 500(c) : 'In order that the actor's conduct may be reckless, it is not necessary that he himself recognize it as being extremely dangerous. His inability to realize the danger may be due to his own reckless temperament or to the abnormally favorable results of previous conduct of the same sort. It is enough that he knows or has reason to know of circumstances which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct.' The rule has been summarized by Holmes : 'The standard applied is external, and the words malice, intent and negligence, as used in this connection, refer to an external standard. If the manifest probability of harm is very great, and the harm follows, we say that it is done maliciously or intentionally ; if not so great, but still considerable, we say that the harm is done negligently ; if there is no apparent danger, we call it mischance.' (Selected Essays on the Law of Torts, p. 162.) '' (See also *Chappell* v. *Palmer,* 236 Cal.App. 2d 34, 35, 38 [45 Cal.Rptr. 686].)

■ It is equally clear that it was necessary and proper to instruct the jury on the rules applicable to one who finds himself in imminent peril.[1] Whether the deceased driver was negligent in following the car ahead of him onto the tracks or whether there was a moment thereafter during which he had to make a choice of actions were issues properly falling within the province of the trier of fact.

Expert testimony confirmed common experience in noting that there is a ''conditioned reflex'' on the part of drivers which causes them to follow the initial movement of vehicles

---

[1]The following instruction was given to the jury : ''A person who, without negligence on his part, is suddenly and unexpectedly confronted with peril arising from either the actual presence or the appearance of imminent danger to himself or to others, is not expected nor required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments. His duty is to exercise only the care that an ordinarily prudent person would exercise in the same situation. (If at that moment he does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might have been followed by an ordinarily prudent person under the same conditions, he does all the law requires of him, although, in the light of after-events, it should appear that a different course would have been better and safer.) ''

ahead of them or beside them after a stop. While the victims of the accident were not present to testify on the issue, it was reasonable for the jury to infer that since the car ahead of theirs had had its moment of decision, decedents also may have been faced with the choice of stopping or proceeding forward when the oncoming train became visible to them. The observations of the court in *McHale* v. *Hall,* 257 Cal.App.2d 342, 349 [64 Cal.Rptr. 694], are equally applicable here: "With reference to the instructing of the jury on the doctrine of imminent peril, it is to be remembered that each party is entitled to instructions upon his theory of the case in the event there is any evidence to support such an instruction. Instructions, of course, may be based upon reasonable inferences from the evidence. [Citations.]

"In the ordinary case it is a question of fact whether there exists a situation of imminent peril. [Citations.] There was ample evidence upon which to base such an instruction."

Without citation of authority or adequate argument, appellant closes its opening brief with the terse contention that there were "other errors prejudicial to defendant." Respondents have correctly answered each of these points in their brief. No useful purpose would be served by lengthening the present opinion with further discussion designed to develop more fully our reasons for rejecting these latter assignments of error.

The judgment is affirmed.

Fleming, J., and Wright, J., concurred.

A petition for a rehearing was denied May 20, 1969.