[Civ. No. 13363. Fourth Dist., Div. Two. Mar. 15, 1974.]

JACK ANDERSON MORGAN, Plaintiff and Respondent, v. SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant and Appellant.

**COUNSEL**

King & Mussell and Bruce MacLachlan for Defendant and Appellant.

Garza, Kassel & Jordan and Florentino Garza for Plaintiff and Respondent.

**OPINION**

**KERRIGAN, Acting P. J.**—A Southern Pacific train ran over a pedestrian, resulting in the amputation of the man's legs. The pedestrian's lawsuit charged wilful misconduct and negligence on the part of the train crew. The jury returned a $175,000 general verdict in his favor.

The railroad's appeal is predicated on two grounds: (1) the court erred in the jury instructions (mainly, in allowing the wilful misconduct issue to go to the jury); and (2) the evidence establishes contributory negligence as a matter of law.

The accident occurred shortly before 8 p.m. (after dark) on February 24, 1971, on Southern Pacific tracks located within the western city limits of Riverside. The single set of tracks was situated within a 50-foot median divider which separated the eastbound and westbound vehicular traffic lanes of Magnolia Boulevard. On the south side of the median were two eastbound lanes; on the north were two westbound lanes. The point of impact was approximately 1,528 feet east of where Magnolia intersected with Fillmore Street.

The land area encompassing the accident site may be characterized as rural-residential, with more homes on the south side of Magnolia than on the north. Open fields separate some of the homes.

Magnolia is a busy, heavily traveled thoroughfare, without curbs or sidewalks. Similarly, no curbs abut the median divider. To avoid the heavy east-west traffic flow, pedestrians commonly walk within the dirt median, either to cross the street or to proceed east or west. Over the years, many persons have been known to walk between the tracks and along the tracks; students utilize the median in going to and coming from school, elderly

people, equestrians and bicyclists cross the tracks or travel along either side; and residents of the area regularly use the median for pedestrian purposes.

On the other hand, trains use the tracks rarely—only three-four times monthly—and no warning signs are located in the median.

The freight train involved in this accident consisted of an engine, a boxcar and a caboose. The train was backing up, with the caboose leading the way, as it proceeded in an easterly direction towards the Riverside metropolitan area at a speed of 8-12 m.p.h. At the time of the impact, the train had traveled only one-third (⅓) of the way to its intended destination.

The crew consisted of four men: (1) the engineer, (2) the head brakeman, (3) the conductor, and (4) the rear brakeman. All were experienced railroaders and thoroughly familiar with the geographical area. For example, the engineer had been on this particular "run" for 30 years. Consequently, the members of the crew either knew, or should have known, that pedestrians commonly used the median divider.

The engineer and head brakeman were inside the engine and did not see the accident; likewise, the conductor was inside the caboose doing some paper work and did not see it. The rear brakeman was standing on the platform of the caboose. He saw the plaintiff walking between the tracks a few seconds prior to impact.

As the train rolled eastward in the backing maneuver, the engine had its "dim" headlight functioning, but it was shining towards the west. There were no lights emanating from the cab of the engine. There were no lights on the boxcar. While the caboose was equipped with a rotating or oscillating red light, it only cast a "beam" of 20 feet.[1]

The rear brakeman had a white trainman's lantern with him as he stood on the rear platform of the caboose. This lantern gave off a "flooding-type" of light. The brakeman had either placed the lantern face down on the deck of the platform or had it in his hand just before the accident; in any event, the lantern was not held or located in a position so that the light would point or shine in the direction the train was moving. In short, the lantern gave no warning.

The engine was properly equipped with bells and whistles. While they were apparently in functioning condition, they were not in operation as the train proceeded eastward.

---

[1] In addition, the caboose was equipped with a stationary red light with a five-inch lens (a "taillight").

In addition, the caboose was equipped with a warning device—an air whistle.

Just prior to the accident, the rear brakeman was standing near the center of the rear platform of the caboose, in close proximity to the air whistle. His job was to keep a lookout for persons who were either on the tracks or close to the tracks. Although he realized that he could not be seen by either the engineer or head brakeman while standing on the caboose platform, he nevertheless remained on the platform from the moment the train started its back-up maneuver.

The rear brakeman first saw the plaintiff at a distance of sixty feet (60′). Plaintiff was walking with his back to the train. While the brakeman testified that he yelled "Look out," he failed to sound the air whistle. In any event, the train traveled 135 feet from the point where it ran over the plaintiff to the point it came to a stop.

Although he apparently suffered from a minor hearing defect, the 59-year-old plaintiff otherwise enjoyed good health and was employed as a ranch-hand.

On the day of the accident, he arrived home from work between 3:30-4 p.m., drank a can of beer, showered, and had a second beer.[2] He did some reading and visited with two friends who came to see him.

Around 7:30 p.m. plaintiff left his home on Magnolia to go to a market located east of his residence on the north side of Magnolia. He walked to the south side of Magnolia, stopped to check for eastbound traffic, and saw defendant's train to his left with the headlight shining away from him (to the west); he also observed the oscillating red light on the rear of the train; the train was then two or three blocks away; when a "break" in the eastbound traffic occurred, he crossed into the median and looked again to his left and saw the train; from his standpoint, the train did not appear to be any closer than when he first saw it; he started to walk east along

---

[2]The evidence is conflicting as to whether plaintiff had any wine. The surgeon who performed the amputation testified that he conferred with the plaintiff and plaintiff was *not* under the influence of alcohol. A pathologist testified that two cans of beer would not have had any deleterious effect upon the plaintiff at the time of the accident. On the other hand, the anesthesiologist who assisted in plaintiff's surgery testified that plaintiff told him that he had consumed a fifth (1/5) of Thunderbird wine before the accident. (Thunderbird contains 19 percent alcohol.) A defense pathologist testified that a person who consumed two cans of beer and a fifth (1/5) of wine within four hours of the accident would be under the influence of alcohol. In any event, the court instructed the jury on the intoxication issue (BAJI No. 5.41) and the jury obviously determined the issue in plaintiff's favor.

the tracks towards the market; he did not hear any train bells, whistles or shouts;[3] his next recollection was waking up in the hospital three-four days afterwards.

After he was admitted to the hospital with both legs severed, heroic medical measures were undertaken. Plaintiff's left leg was amputated below the knee; his right leg was amputated above the knee. He remained hospitalized for 5 months; then spent 10 months in a rest home; and thereafter, he experienced 10 months in a rehabilitation hospital.

Because of his age, the severity of the injuries, and the sensitivity factor (pain in the stumps), prosthetic devices have not proven satisfactory. Plaintiff will undoubtedly be confined to a wheelchair for the rest of his life.

### WILFUL MISCONDUCT

The railroad maintains that the court erred in denying its motion for a nonsuit on the wilful misconduct cause of action at the close of plaintiff's case and compounded the error by instructing the jury on the elements of the doctrine (BAJI No. 3.52). The argument is premised on the ground there was insufficient evidence to allow the case to go to the jury on that theory of liability.

"Wilful or wanton misconduct" travels under several other names. Its aliases include "serious and wilful misconduct," "wanton misconduct," "reckless disregard," "recklessness," and combinations of some or all of these. These terms are interchangeable because they all identify the same thing—"an aggravated form of negligence, differing in quality rather than degree from ordinary lack of care" (Prosser, Law of Torts (4th ed. 1971), § 34, p. 184; see also 35 Cal.Jur.2d, Negligence, § 200, p. 722). "The usual meaning assigned to 'wilful,' 'wanton' or 'reckless,' according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." (Prosser, Law of Torts (4th ed. 1971) § 34, p. 185.) The wilful misconduct instruction given by the trial court in this case (BAJI No. 3.52) contains substantially the same wording as Prosser's formulation. The cases, treating the concept under one or another of its labels, define it substantially the same way. (*Reuther* v. *Viall*, 62 Cal.2d 470 [42 Cal.Rptr. 456, 398 P.2d 792]; *Meyer*

---

[3] A witness who lived near the scene also testified that she heard no whistles, bells or shouts before the accident.

v. *Blackman,* 59 Cal.2d 668 [31 Cal.Rptr. 36, 381 P.2d 916]; *Goncalves* v. *Los Banos Mining Co.,* 58 Cal.2d 916 [26 Cal.Rptr. 769, 376 P.2d 833]; *Cope* v. *Davison,* 30 Cal.2d 193 [180 P.2d 873, 171 A.L.R. 667]; *People* v. *Young,* 20 Cal.2d 832 [129 P.2d 353]; *Donnelly* v. *Southern Pacific Co.,* 18 Cal.2d 863 [118 P.2d 465]; *Meek* v. *Fowler,* 3 Cal.2d 420 [45 P.2d 194]; *Harrington* v. *Los Angeles Ry. Co.,* 140 Cal. 514 [74 P. 15]; *Esrey* v. *Southern Pacific Co.,* 103 Cal. 541 [37 P. 500]; *Olea* v. *Southern Pacific Co.,* 272 Cal.App.2d 261 [77 Cal.Rptr. 332]; *Chappell* v. *Palmer,* 236 Cal.App.2d 34 [45 Cal.Rptr. 686]; *Pelletti* v. *Membrila,* 234 Cal.App.2d 606 [44 Cal.Rptr. 588]; *Givens* v. *Southern Pacific Co.,* 194 Cal.App.2d 39 [14 Cal.Rptr. 736].)

Also in accord with Prosser are Witkin (2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 361, p. 1562 and (1969 Supp.) § 361, p. 730) and the Restatement (Rest.2d Torts, § 500).

■ Three essential elements must be present to raise a negligent act to the level of wilful misconduct: (1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril. (*Williams* v. *Carr,* 68 Cal.2d 579 [68 Cal.Rptr. 305, 440 P.2d 505]; *Olea* v. *Southern Pacific Co., supra,* 272 Cal.App.2d 261, 265.)

In *Donnelly* v. *Southern Pacific Co., supra,* 18 Cal.2d 863, the court made it clear that the same standard of care is applied to railroads as to other defendants—no more and no less. The fact that carelessness in the handling of a train wreaks a far greater quantum of havoc than carelessness in riding a bicycle does not change a railroad's negligence into recklessness; thus, a switchman's inadvertent act in throwing a switch the wrong way was characterized as negligence. Consequently, the conscious disregard of a known risk remains the essence of wanton and wilful misconduct.

While no case has held the backing of an engine to be reckless per se, two California (and a number of out-of-state) cases have made note of the increased danger attendant to such an operation. (*Green* v. *Southern Pac. Co.,* 53 Cal.App. 194 [199 P. 1059]; *Wing* v. *Western Pacific R. R. Co.,* 41 Cal.App. 251 [182 P. 969]; Annot.: Railroad Crossing—Collision, 85 A.L.R.2d 275.) Such a maneuver increases the burden on the crew to proceed with an awareness of the special dangers involved.

In *Olea* v. *Southern Pacific Co., supra,* 272 Cal.App.2d 261, the wilful misconduct doctrine was applied against a railroad in the following circumstances: The accident occurred at a busy (5,000 cars daily) grade cross-

ing in an industrial area; the view of on-coming drivers was obstructed by a hill; four (4) sets of tracks crossed the road; without crossing gates, the danger existed that when a train had passed on one track, vehicles might move forward into the path of a train approaching on one of the other tracks; the train which hit the plaintiff was traveling 60 m.p.h.; and there had been three (3) prior accidents at the crossing; the court held that it was not error to instruct on the doctrine of wilful misconduct because the only crossing signal was a "wigwag" and there was expert testimony establishing that crossing gates should have been installed at that particular crossing prior to the accident.

Southern Pacific argues that the case under review is clearly distinguishable from the facts in *Olea* and that therefore the wilful misconduct instruction should *not* have been given. In support of its argument, defendant claims that here we have only a single set of tracks proceeding through a rural-residential area; the speed of the train was only 8-12 m.p.h.; the accident happened upon railroad property, not upon a public highway; and there was no evidence of prior accidents in the area and, therefore, there was no actual knowledge of possible peril to pedestrians.

Here the defendant's train was engaged in a backing up maneuver at night with the engine shoving a boxcar and a caboose. Outside of the yard limits, this type of movement is recognized as potentially dangerous. The Southern Pacific's own rules[4] required its crews to use caution in backing a train. The crew on this "run" acknowledged the maneuver had to be made with caution. A slow speed is absolutely essential; two of the crewmen testified that any speed in excess of 10 m.p.h. would be regarded as unsafe. Yet, after the accident, one of the crew members (in reporting the accident to his superiors) estimated the train's speed at 10-12 m.p.h.

All the crew members had been on this particular run for a period ranging from 12-30 years. Each knew that pedestrians, bicyclists and equestrians crossed the tracks or walked in the median. The engineer and the head brakeman were unable to see in front of the caboose; they had to rely solely on the rear brakeman for signals. Defendant's safety rules required that the rear brakeman place himself in a conspicuous place on the caboose so he could signal the engineer and head brakeman. Under the same rules, any time the rear brakeman disappears from view of the engineer or head brakeman, such condition mandates the stopping of the train.[5] Here, the

[4]"Rule 836. Outside of yard limits cars must not be shoved ahead of engine between stations, when it can be avoided."

[5]"Rule 7-B. Signals must be given and acted upon strictly in accordance with the rules. Trainmen, enginemen, and others must keep vigilant lookout for signals. Those

rear brakeman occupied a position on the rear platform of the caboose where he could not be seen by the engineer or head brakeman. Defendant's rules required that in backing up at night, a white light be exhibited on the platform of the caboose.[6] While the rear brakeman had a white light, it was inexplicably hidden from public view. Upon his arrival at the scene of the accident, the investigating officer testified that he checked for lighting conditions at the rear of the caboose and found only an oscillating red light in operation. He was neither shown nor told of any other lights on the back end of the caboose. Obviously, the only reason for the white light requirement was to warn pedestrians and motorists of the direction in which the train was traveling and to warn them of the approach of the train, thereby avoiding miscalculations on the part of the general public. Finally, defendant's rules requiring that bells and whistles be sounded[7] whenever necessary to warn of the approach of the train were violated as no bells or whistles were sounded as the train engaged in the back-up maneuver. In fact, the rear brakeman failed to sound the air whistle *after* he saw the plaintiff although he was standing in very close proximity to the whistle.

■ Summing up, the existence of wilful misconduct is essentially a question of fact (*Reuther* v. *Viall, supra,* 62 Cal.2d 470, 475; *Meyer* v. *Blackman, supra,* 59 Cal.2d 668), and the plaintiff was entitled to instructions defining the doctrine inasmuch as there was substantial evidence in support of the theory. (See *Phillips* v. *G. L. Truman Excavation Co.,* 55 Cal.2d 801, 806-807 [13 Cal.Rptr. 401, 362 P.2d 33].) Sound, solid proof existed that the immediate area where the collision occurred constituted a danger in that pedestrians frequently used the divider; that the members of this particular train crew had knowledge of the potential danger presented by the use of the divider for pedestrian purposes; that backing a

---

giving signals must locate themselves so as to be plainly seen. Signals must be given in such a manner that they cannot be misunderstood . . .

"In backing engine or cars, or shoving cars ahead of engine, disappearance from view of trainmen or lights by which signals controlling the movement are being given must be construed as a stop signal."

[6]"Rule 103. When cars are pushed by an engine, except when switching either within or outside of yard limits, . . . a member of the crew must take a conspicuous position on leading car. By night he must display a white light."

[7]"Rule 30. Engine bells must be rung when engine is about to be moved; . . . while approaching public crossings . . .; and elsewhere when necessary as a warning signal.

"Rule 31. Whistle must be sounded at all places where required by rule or law, and elsewhere when necessary as a warning signal . . ."

"Rule 103-B. Passenger trains normally required to make back-up movements, and trains moving with caboose as leading car, must be equipped with back-up hose or pipe with whistle attached."

train is a dangerous operation if not properly performed; that this train was traveling at an unsafe rate of speed as it proceeded backwards; that no precautionary measures were taken by the crew as they approached the accident site; that no warning (such as sounding the air whistle) was given after plaintiff's peril was discovered; and that serious injury resulted from the crew's wrongful conduct. The foregoing factors were sufficient to bring the wilful misconduct doctrine into play.

Consequently, the trial court acted with propriety in denying the motion for a nonsuit and in instructing the jury on the doctrine of wilful misconduct.

### CONTRIBUTORY NEGLIGENCE

Finally, Southern Pacific claims that the trial court committed the following errors: (1) in instructing the jury on the doctrine of last clear chance (BAJI No. 4.20); (2) in instructing the jury on contributory negligence—forgetfulness of known danger (BAJI No. 3.51); and (3) in denying its motion for a new trial on the ground that plaintiff was contributorily negligent as a matter of law.

In view of our determination that the jury could have properly determined on the basis of substantial evidence that the train crew was guilty of wilful misconduct, and in light of the fact that the jury returned with a general verdict in favor of the plaintiff and that the judgment is sustainable on the wilful misconduct theory, it is unnecessary to treat the allied issues involving the doctrine of contributory negligence. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 223 at p. 4212.) Contributory negligence is no defense to the charge of wilful misconduct. (*Williams* v. *Carr, supra,* 68 Cal.2d 579; *Donnelly* v. *Southern Pacific Co., supra,* 18 Cal.2d 863, 870; Prosser, Law of Torts (4th ed. 1971) § 34, pp. 184-185.)

The judgment is affirmed.

Tamura, J., and Kaufman, J., concurred.

A petition for a rehearing was denied April 4, 1974.