[Civ. No. 33932. First Dist., Div. Two. May 28, 1975.]

STEPHEN W. FULLER, a Minor, etc., Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

## COUNSEL

Jack Miller, Richard L. Katz, Robert A. Harlem, Brown, Dick, Reece & Lane and John Russell for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Wayman M. Robertson, Jr., Deputy Attorney General, Russ, McConnell & Tarkington and Wilbur J. Russ for Defendants and Respondents.

## OPINION

**BRAY, J.***—Plaintiff appeals from a judgment of the Santa Cruz County Superior Court, after jury verdict, in favor of defendants.

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

QUESTIONS PRESENTED

1) Section 831.2 of the Government Code providing immunity for injury caused by a natural condition of unimproved public property applies.

2) Whether plaintiff's injury was caused by a dangerous condition of public property was a jury question.

3) Instruction on assumption of risk was proper.

4) Instruction on contributory negligence was proper.

5) Instruction on prior accidents was proper.

6) Evidence of subsequent accidents not admissible.

7) Plaintiff's proposed instructions were properly refused.

 a) Instruction 12 (care required of minor).

 b) BAJI No. 3.38 (modified)(care required for safety of minor).

 c) Instruction 15 (contributory negligence).

 d) Instructions 6 and 7 (definitions of "dangerous condition").

 e) Instruction 4 (condition of adjacent property).

 f) Instruction BAJI No. 3.52 (wilful misconduct).

 g) Instruction 11 (the California State Park and Recreation Commission's statement of policy).

 h) Instruction 8 (party voluntarily undertaking to perform a task).

 i) Instruction 9 (ownership or control of the property).

 j) Instruction 10 (ownership or control of the property).

 k) Instruction on duty to warn.

8) No error in giving certain instructions.

 a) City's instruction 17 (public employee not liable for acts of discretion).

 b) City's instruction 14 (based on *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508]).

 c) City's instruction 10 (unauthorized acts of an employee).

9) No misconduct by the trial judge.

10) Court's denial of motion to proceed in forma pauperis cannot be reviewed on appeal.

## Record

A complaint for personal injuries was filed by Stephen W. Fuller, a minor, by and through his guardian ad litem, John W. Fuller, against the State of California (hereinafter "State") and City of Santa Cruz (hereinafter "City") as defendants charging said defendants with carelessness and negligence in connection with the injuries received by Stephen in diving into the Pacific Ocean from a cliff in Twin Lakes Beach State Park. The defendants answered separately denying responsibility and setting up the defenses of assumption of risk, contributory negligence, immunity provided by Government Code section 831.2 and various other government code sections. Plaintiff's motion for leave to proceed in forma pauperis was denied. Defendant City's motion for summary judgment was denied. After trial, the jury found a verdict in favor of defendants and judgment was entered thereon. Plaintiff appeals.

## Facts

Stephen, then 17 years old, and 3 friends, Gary Woodard, Joe Semas, and Steve Alldrin, came to Santa Cruz from Stockton. The next day, July 4, they swam at both of the beaches next to San Lorenzo Point (hereinafter "the Point"). The City beach lies to the west of the Point, the State beach to its east. The Point and the State beach are part of Twin Lakes State Park. The boys went from one beach to the other through the "blow hole" or tunnel under the Point. The Point is a narrow, rocky finger of land extending into the ocean and rising to a height of 15-20 feet above the adjacent beaches. Access to its slope can be had from the

City side. There are no park facilities of any kind on the Point. From a walk or ledge lying part way up the Point on its City side the boys made the jumps and dives hereinafter described. The lifeguards on the State beach could not see this spot as the top of the Point was higher and blocked the view. Nor if a lifeguard was on the top of the Point would he have been able to see the dives.

While his friends were body surfing off the City beach Stephen climbed up the Point and sat at a point estimated by the boys as being 8-10 feet, 10-12 feet or 10-15 feet above the water. This is the place from which the jumping or diving took place. The boys estimated the depth of this water, absent a wave, variously as up to the bottom of Stephen's chest, middle of his chest, or 3-4 feet. A City lifeguard testified that it was 1-3 feet.

Stephen jumped into the water and then returned to the same spot. Woodard joined Stephen and the 2 boys talked for 10 or 15 minutes about diving but neither wanted to dive first. Neither had ever seen anyone dive from the Point. Woodard told Stephen that it would be better to dive on the wave rather than between waves. Both Woodard and Stephen testified that the wave would add about two feet to the depth of the water. Woodard told Steve to dive because a wave was coming. Stephen made a flat dive. After Stephen surfaced and stood in the water he informed Woodard there was enough water to dive into "with the wave."

On Stephen's return to the spot, Woodard dove on a wave. He scraped his foot on the bottom. Woodard said that he dove as flat as he could because "you had to project over the ledge right there." Both boys testified that at the time they did not believe it was dangerous to dive from the Point. Prior to diving a second time Woodard told Stephen he had scraped his foot on his dive. He asked if Stephen had done so too. Stephen said that he had not even touched bottom. They then talked about who should now dive first. Alldrin then came to the spot where the other two were. He didn't want them to dive but the others said that it was okay because they had made one dive already. Woodard told Stephen to dive first as a wave was coming in but Stephen said he didn't want to dive right then. So Woodard dove. When he surfaced he called to Stephen to hurry up and dive because a wave was still in and it was still deep. Stephen saw Woodard standing and bobbing in the water and dove. He felt a snap in his neck and there was a dark flash in front of his eyes. Since there were no rocks or other objects under the water at the point of the dive, it is apparent that Stephen hit the bottom.

Diving and jumping from the Point had been a common practice of young persons for years prior to this accident, which practice was well known to State and City lifeguards. State and City employees also knew of injuries suffered by other persons as a result of diving or jumping from the Point and considered diving therefrom a dangerous activity.

Construction of the Santa Cruz yacht harbor and jetty in 1962 had caused a steady buildup of sand on the beach and around the Point and a corresponding decrease in water depth. Prior to the accident the public entities had placed on the State beach five portable lifeguard towers, restroom facilities and concrete fire rings. There were well defined paths and steps on the Point. The beach area was heavily patronized. City lifeguards had been instructed to warn persons whom they observed at the Point that it was hazardous to dive therefrom. On occasion City lifeguards had been stationed on the Point to discourage the public from coming there. State and City lifeguards and their supervisors had met concerning the problem of people diving off the Point. Warning signs discouraging diving had been erected on and around the Point in previous years but were not replaced when no longer there. There were no warning signs at the time of Stephen's injuries.

1) *Section 831.2 of Government Code.*

█ The trial court instructed the jury on the immunity of section 831.2[1] leaving to it to determine whether the "condition" alleged to have caused the injury was "natural" and whether the property on which the condition existed was "unimproved" public property. Plaintiff contends that the trial court erred in so instructing the jury and in failing to rule that as a matter of law said section did not apply to the circumstances of the case. Plaintiff based this contention primarily on the fact that in 1962 jetty and yacht harbor construction by the United States Army Corps of Engineers had been performed some 3,000 feet down the coast from the Point, and in 1959 rip rock work had been done on the banks of the San Lorenzo River somewhere upstream, by whom does not appear, indirectly causing a sand buildup around San Lorenzo Point resulting in shallower water in 1969 (the year of the accident) than in the 1950s prior to said work. Plaintiff also contended that the area had been further developed by the placement of restrooms, fire rings, lifeguard towers and signs along the beach extending near the Point.

---

[1]Section 831.2 provides, "Neither a public entity nor a public employee is liable for an injury caused by a *natural condition* of an *unimproved* public property, including but not limited to any *natural condition* of any lake, stream, bay, river or beach." [Italics added.]

Section 831.2 presents two fact questions, whether the "condition" at the Point was "natural" and whether the property there was "unimproved" public property. (Obviously it was public property.)

The contention that the location on the beach of the portable lifeguard towers, restroom facilities, and concrete fire rings make the area *improved* public property rather than *unimproved* in the application of 831.2 is well answered in *Rendak* v. *State of California* (1971) 18 Cal.App.3d 286 [95 Cal.Rptr. 665] (hg. den. Sept. 2, 1971). There it was contended that the construction on the beach of restrooms and some "fire rings," circles of concrete set in the sand for building of fires, excluded from the application of section 831.2 that area of the beach and particularly the area where a portion of a cliff slipped into the sea killing the plaintiff. The court held that such construction did not change the "natural condition" of the beach or make it "improved" public property in the light of 831.2. The court, in holding that improvement of a park area does not remove the immunity from the unimproved area, indicated that the immunity granted by the section is to be given a broad application as it pointed out that the Legislature in adopting the section did not adopt the narrow one originally recommended by the Law Revision Commission (4 Cal. Law Revision Com. Rep. (1963) p. 852).

The construction of the yacht harbor and jetty and the rip rock work done on the river obviously was not the type of improvement to either the park, the Point or the beach that would take the area out of the immunity provision of section 831.2 nor did they in any way change its "natural" condition. The cliff, except for paths worn by people using the area, and the beach, except for a small addition to sand, were still in a natural condition.

The former captain of the City lifeguards testified, that by the work done in the sea and the river the water in the ocean did not get any shallower, it was just that the place where the beach started was farther out; in other words, that the water did not come as far in. There was evidence also that the bottom around the Point continually shifted because of weather and seasons. These slight changes could not be described as improvements to the beach, nor did they in any way cause the depth of the water to be misleading. Thus, the jury could have logically and reasonably found that the ocean was in a "natural condition" despite the construction activities which occurred.

*Hawk* v. *City of Newport Beach* (1956) 46 Cal.2d 213 [293 P.2d 48], cited by plaintiff is not in point. It was decided some seven years before the adoption of section 831.2 and merely holds that a natural condition may under certain circumstances constitute a dangerous condition, a determination that cannot be gainsaid. Plaintiff has cited no authority to the effect that a change of the amount of sand in the bottom of the ocean over which the waves come and go makes the condition no longer a natural one.

Essentially, plaintiff would have this court rule that a condition affected in any way by human activity is not a "natural condition." It is not possible that in creating section 831.2 the Legislature intended such a narrow construction of the term. This court may take judicial notice that up and down the coast of California, including its bays and river mouths, the combined acts of men and of nature have caused substantial change to the coastline's condition. It cannot be said wherever such has occurred and an area of the coast is no longer in the pristine state which it was prior to the population of California, that the Legislature intended such an area to be excluded from the application of section 831.2. While each case must be decided on its own facts, it is clear that in the case at bench the additional sand did not so alter the beach as to remove it from the meaning of "natural condition" in the section. The evidence does not show that either the City or the State by its acts participated in the sand buildup. Rather, some distance from the Point activities were undertaken which when combined with natural forces resulted in increased sand around the Point.

Additionally, that the Legislature did not intend a narrow construction of the section is shown by the Legislative Committee comment to the section: "This section and Section 831.4 continue *and extend* an existing policy adopted by the Legislature in former Government Code Section 54002. It is desirable to permit the members of the public to use public property in its natural condition and to provide trails for hikers and riders and roads for campers into the primitive regions of the State. But the burden and expense of putting such property in a safe condition and the expense of defending claims for injuries would probably cause many public entities to close such areas to public use. In view of the limited funds available for the acquisition and improvement of property for recreational purposes, it is not unreasonable to expect persons who voluntarily use unimproved public property in its natural condition to assume the risk of injuries arising therefrom as a part of the price to be paid for benefits received." [Italics added.]

The evidence demonstrates that the scene of plaintiff's accident was in a natural condition of unimproved public property.

### 2) *Dangerous condition of public property a jury question.*

█ Plaintiff contends that the court erred in denying his motion for directed verdict on the liability issue of "dangerous condition" of public property.[2] He based the motion on his contention that diving from the Point was a dangerous activity and that defendants knew that the Point had been used for diving. This ignores the definition of "dangerous condition" as set forth in Government Code section 830, subdivision (a): " 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." Under the section it is a use with "due care" that is to be foreseeable not merely foreseeability of a particular use.

The California Law Revision Commission comment on section 830 which was officially approved by the Legislature and may be used as a guide to legislative intent (*Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 249-250 [66 Cal.Rptr. 20, 437 P.2d 508]), states in pertinent part: "A condition is not dangerous within the meaning of this chapter unless it creates a hazard to those who foreseeably will use the property or adjacent property with due care. Thus, even though it is foreseeable that persons may use public property without due care, a public entity may not be held liable for failing to take precautions to protect such persons."

That the use of the Point for diving by members of the public shows a lack of due care cannot be gainsaid. One lifeguard said the diving was "foolish," another compared it to driving too fast on the freeway and another witness said that it was a "hazardous act."

Actually there was no "dangerous condition" of public property. There was no irregularity in the ocean bottom, no submerged rocks or other objects under the surface. Plaintiff testified that he had so ascertained. "The 'dangerous condition' of the property should be defined in terms of the manner in which it is foreseeable that the property will be used by persons exercising due care in recognition that

---

[2]Liability for a "dangerous condition" of public property is imposed by Government Code section 835.

*any property can be dangerous if used in a sufficiently abnormal manner.* [Italics added.] Thus, a public entity should not be liable for injuries resulting from the use of a highway—safe for use at 65—at 90 miles an hour, even though it may be foreseeable that persons will drive that fast. The public entity should only be required to provide a highway that is safe for reasonably foreseeable *careful* use." (4 Cal. Law Revision Com. Rep. (1963) p. 822.)

Most of the cases cited by plaintiff were decided prior to the change in the California Tort Claims Act and when the law did not include the "due care" element and none of the other cases cited involved facts even remotely similar to those of this case. Nor has plaintiff cited any authority holding that any public property was dangerous as a matter of law. If determination of that issue were a matter of law, the trial court in the instant case would have had to hold that the public property involved was not in a dangerous condition.

### 3) *Assumption of risk.*

 Even if section 831.2 were not applicable the evidence fully supports the jury verdict as it is clear that the accident was caused by plaintiff knowingly taking a chance that the wave into which Woodard had just dived would remain long enough to provide sufficient depth of water to enable plaintiff to safely dive into it. Although plaintiff strongly urges that the doctrine of assumption of risk should be abolished, at the time of the trial herein, it was still a part of the law in this state.[3] As plaintiff points out, under *Vierra* v. *Fifth Avenue Rental Service* (1963) 60 Cal.2d 266 [32 Cal.Rptr. 193, 383 P.2d 777], the doctrine as a defense is not available unless the plaintiff had actual knowledge of the particular danger and appreciation of the magnitude of the risk involved in his activity. The jury here was so instructed. Actual knowledge of the particular risk and its magnitude may be inferred from the circumstances (*Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 244 [53 Cal.Rptr. 545, 418 P.2d 153]). "Such elements, however, need not be established as a matter of law; and the elements may be proven circumstantially by evidence from which the fact in question can reasonably be inferred. [Citation.]" (*Cooper* v. *Lunsford* (1965) 234 Cal.App.2d 554, 560 [44 Cal.Rptr. 530].)

---

[3]*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226], abolished the doctrine of assumption of risk to the extent that it is merely a variant of the doctrine of contributory negligence. However, that decision specifically applied only to cases in which trial had not begun before the effective date of the decision.

The evidence from which plaintiff's knowledge of the particular danger of diving from the Point could be, and evidently was, inferred by the jury is overwhelming. The danger of striking bottom when diving head first into shallow water was perfectly obvious. The between-wave height above the water from which the dives were made was 10-15 feet and the then depth of the water was variously estimated as from 1-3 feet to mid-chest. Waves added about two feet to the depth. Plaintiff had been swimming in the area on the day in question. Woodard and plaintiff talked about diving and neither wanted to dive first. They agreed that they would dive only on the wave and not between waves. Plaintiff jumped and dove once into the exact spot before he was injured. After his first dive plaintiff stated to Woodard when the latter asked whether the water was deep enough to permit diving that it was "with the wave." Woodard struck bottom with his feet when he dove. Clearly plaintiff knew the danger of diving should the wave be receding. Alldrin didn't want them to dive but they told him it was okay, they had already dived. Just before he dove the second time plaintiff saw Woodard standing and bobbing in the water. Plaintiff knew when he made the second dive that it was only safe if the wave into which Woodard had dived was still in as Woodard told him to "hurry up" because the wave was still in. Thus, either the wave, when plaintiff dove, was not still in or he dove too deep in water which even with the wave up was rather shallow. Plaintiff knew this.

Plaintiff's statement that he did not think there was any danger is incredible in view of the circumstances and was unlikely to be believed by the jury. It was a matter for their determination. See *Beard* v. *Atchison, Topeka & Santa Fe Ry. Co.* (1970) 4 Cal.App.3d 129, 138 [84 Cal.Rptr. 449], where the court said: ". . . it is doubtful that a trier of fact would believe that plaintiff at the age of 14 did not know and had never been told about the danger involved in boarding a moving freight train, . . ." Also, *O'Keefe* v. *South End Rowing Club* (1966) 64 Cal.2d 729, 743 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1] where the court said: "We cannot conceive of high school youths in their middle teens failing to realize that at least out to a certain point on such a pier the water below remains too shallow for safe diving."

The requisite knowledge of the magnitude of the risk does not require that the exact nature of the injury be foreseen. It was held in *Tavernier* v. *Maes* (1966) 242 Cal.App.2d 532 [51 Cal.Rptr. 575], that the fact that the injury (a softball player slid into the plaintiff) was more severe than might be expected, did not deprive the defendant of the defense of assumption of risk.

The court properly instructed on the doctrine of assumption of risk.

4) *Contributory negligence.*

" 'The defenses of assumption of risk and contributory negligence are based on different theories. ■ Contributory negligence arises from a lack of due care. The defense of assumption of risk, on the other hand, will negative liability regardless of the fact that plaintiff may have acted with due care. (See Prosser on Torts [1941] p. 377.) It is available when there has been a voluntary acceptance of a risk and such acceptance, whether express or implied, has been made with knowledge and appreciation of the risk. (See Rest., Torts, § 893.) Where the facts are such that the plaintiff *must have had knowledge of the hazard,* the situation is equivalent to actual knowledge, and there may be an assumption of the risk, but where it merely appears that he *should or could have discovered the danger* by the exercise of ordinary care, the defense is contributory negligence and not assumption of risk. . . .' " (*Grey* v. *Fibreboard Paper Products, supra,* pp. 243-244.) "While contributory negligence and assumption of risk are two different legal doctrines, one being based on a failure to exercise due care in the circumstances and the other being based upon voluntary exposure to a known risk, it is nevertheless true that the two doctrines overlap in many situations." (*Grey* v. *Fibreboard Paper Products, supra,* p. 245.) " ' "[I]f, from the evidence, the jury could legitimately draw some inference showing that contributory negligence on the part of plaintiff proximately contributed to the causation of the accident and injuries complained of, the giving of the instruction on contributory negligence is proper and the question becomes one of fact for the jury." ' " (*Wigodsky* v. *Southern Pac. Co.* (1969) 270 Cal.App.2d 51, 57 [75 Cal.Rptr. 419].) ■ The facts of the height from which the dives were made and the depth of the water alone were more than sufficient to support a jury determination that plaintiff was negligent particularly as plaintiff knew the shallowness of the water and that Woodard had scraped his foot on the bottom on his first dive. Also one lifeguard testified to the foolishness of diving from the Point and another compared it to driving too fast on a freeway.

■ Contrary to defendants' contention, plaintiff's awareness of the danger is not a necessary element of the defense of contributory negligence. Constructive knowledge is sufficient. (*Prescott* v. *Ralphs Grocery Co.* (1954) 42 Cal.2d 158, 161-162 [265 P.2d 904].) ■ The evidence clearly shows that plaintiff did not use ordinary care, and that the court properly instructed on the defense of contributory negligence.

As with the doctrine of assumption of risk, plaintiff contends that the contributory negligence defense should be abolished. However, at the time of the trial of this case, it was still the law in California. (See 35 Cal.Jur.2d, Negligence, § 210, p. 731 [1974 Supp. p. 142].)[4]

5) *Prior accidents instruction.*

■ The trial court instructed that the evidence of prior accidents which was admitted could be considered only on the issue of notice.

"Before evidence of previous injuries may be admitted on the issue of whether or not the condition as it existed was in fact a dangerous one, it must first be shown that the conditions under which the alleged previous accidents occurred were the same or substantially similar to the one in question. [Citations.] The strictness of this requirement of similarity of conditions is 'much relaxed,' however, when the purpose of the offered evidence is to show notice, . . ." (*Laird* v. *T. W. Mather, Inc.* (1958) 51 Cal.2d 210, 220 [331 P.2d 617].)

Plaintiff's evidence as to prior accidents consisted of a State accident report form and general testimony of former lifeguards that in the past there had been incidents in which divers had suffered scratches and abrasions, plus one serious injury 5 years before where a young man dove from a height of 40 feet into 4 feet of water. No details of the other incidents were shown nor the location of the dives and depth of the water shown, nor anything to show that due care was exercised by the divers. Since no similarity of circumstances was shown as to any prior accident, the evidence did not tend in any way to show that the property on which plaintiff was injured created a substantial risk of injury when used with due care. The instructions were obviously proper.

6) *Evidence of subsequent accidents.*

■ While evidence of subsequent accidents is admissible to prove the existence of a defective or dangerous condition and actionable negligence as well as notice (*People* v. *Lang Transportation Corp.* (1941) 43 Cal.App.2d 134, 141 [110 P.2d 464]), such evidence must, like

---

[4]On March 31 in *Li* v. *Yellow Cab Co., supra,* page 829, our Supreme Court replaced the doctrine of contributory negligence with that of comparative negligence and abolished the doctrine of contributory assumption of risk, but expressly provided that the opinion "shall not be applicable to any case in which trial began before" the date on which the decision becomes final.

evidence of prior accidents, show similarity of conditions to the one in question. Plaintiff neither by offer of proof nor otherwise, offered to prove such similarity. In view of that situation the trial court properly refused admission of evidence of subsequent accidents. Moreover, the court stated: "*Witkin* does say that subsequent accidents ought to be admissible on the theory of a dangerous condition. It is my ruling that the relevance of subsequent accidents would be outweighed by the consumption of time and I base that on section 352 of the Evidence Code."

7) *Instructions refused.*

a) *Plaintiff's No. 12.*

This instruction, a modification of BAJI No. 3.35, was argumentative in stating that "[b]oys of 17, particularly in groups where the herd instinct and competitive spirit tend naturally to relax vigilance." Also, there was no evidence that plaintiff and his friend were activated by the herd instinct. Moreover, that plaintiff was only required to exercise the degree of care ordinarily exercised by adolescents of like maturity, intelligence and capacity under similar circumstances was clearly shown in the instructions given by the court. The court is not required to instruct "in any particular language or phraseology requested by a party if the subject matter of the requested instruction is fully and fairly covered in other instructions given to the jury." (*Burke* v. *John E. Marshall, Inc.* (1940) 42 Cal.App.2d 195, 204 [108 P.2d 738].)

b) *BAJI No. 3.38 (modified) (care required for safety of minor).*

In modifying this instruction as given in BAJI, plaintiff made the major part of it nonunderstandable. "Courts are not [required] to reframe erroneous or incomplete instructions and parties cannot complain that an instruction of that character has not been given." (*Bertolozzi* v. *Progressive Concrete Co.* (1949) 95 Cal.App.2d 332, 337-338 [212 P.2d 910].)

c) *Instruction 15 (contributory negligence).*

This dealt with plaintiff voluntarily exposing himself to a known danger. It is not a correct exposition of the law. Moreover, the subject was fully covered in BAJI Nos. 3.10 (modified), 3.11 (modified) and 3.12 given by the court.

d) *Instructions 6 and 7 (definitions of "dangerous condition.")*

This subject was fully covered in BAJI Nos. 11.54 and 3.35 given by the court. ██ The trial court is not required to give every instruction offered by a litigant nor is a party entitled to have the substance of instructions given by the court repeated in different language. (*Thompson v. Keckler* (1964) 228 Cal.App.2d 199, 212 [39 Cal.Rptr. 267].)

e) *Instruction 4 (condition of "adjacent property exposing those using public property to a substantial risk of harm.")*

It is impossible to understand the application of this instruction to the facts of this case. Plaintiff claimed that the Point and the ocean floor were in a dangerous condition. It all belonged to the State. There was no adjacent property involved.

f) *Instruction BAJI No. 3.52 (wilful misconduct).*

There was no evidence of wilful misconduct. " 'The usual meaning assigned to "wilful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' (Prosser, Law of Torts (4th ed. 1971) § 34, p. 185.) The wilful misconduct instruction [refused] by the trial court in this case (BAJI No. 3.52) contains substantially the same wording as Prosser's formulation. The cases, treating the concept under one or another of its labels, define it substantially the same way. [Citations.]" (*Morgan* v. *Southern Pacific Trans. Co.* (1974) 37 Cal.App.3d 1006, 1011-1012 [112 Cal.Rptr. 695].) The trial court properly refused to give the offered instruction.

g) *Instruction 11 (the California State Park and Recreation Commission's Statement of Policy).*

This was a quotation from a manual entitled "Policies, Rules, Regulations and Orders." The manual does not purport to contain statements of the law. There is nothing in the Public Resources Code pursuant to which the manual was prepared which justified giving the quotation as an instruction to the jury, nor does plaintiff cite any authority therefor. The law as to public entity liability for dangerous conditions of public property is contained in the Government Code.

h) *Plaintiff's instruction 8 (party voluntarily undertaking to perform a task).*

Plaintiff contends that as the State owned the Point, the instruction was necessary to assess the City's liability arising from claimed exertion of control over the Point.

The failure to give the instruction was harmless in view of the other instructions which covered the City's duties and the strong evidence supporting the verdict.

There was some evidence in the instant case (though conflicting) that the City lifeguards had voluntarily agreed with the State lifeguards to have alternating roving guards on the Point, and that this plan had been put into effect. The evidence was uncontested that on the day of the accident there were no City lifeguards in the area of the Point. On first impression therefore it appears that in light of the evidence plaintiff's proposed instruction should have been given. ■■■ However, while a duty of ordinary care *may* arise from such a voluntary relationship, such duty is not absolute and will exist only where required by public policy. And, the determination of whether a duty of care exists is a question of law for the court. (*Walnut Creek Aggregates Co.* v. *Testing Engineers, Inc.* (1967) 248 Cal.App.2d 690, 696-697 [56 Cal.Rptr. 700].)

i) and j) *Instructions 9 and 10 dealing with ownership and control of the Point.*

■■■ Instruction 9 was to the effect that the court found that the State owned the Point but that it was controlled by both the State and the City. Plaintiff's instruction 10 was proposed as an alternative to instruction 9. It was to the effect that the jury should determine if the City also controlled the property.

Under Government Code section 830, subdivision (c), public property is defined as ". . . real or personal property owned or controlled by the public entity, . . ." Plaintiff claims error in the court's refusal to give its proposed instruction 9 to the effect that the Point was "controlled" by the City. Plaintiff contends that the City's control over the property was established as a matter of law by the evidence (1) that City lifeguards assumed the responsibility of treating persons injured on the City side of the Point because State lifeguards could not see accidents occurring in that area, (2) that City lifeguards had been instructed to warn persons

seen on the Point that it was dangerous to dive from there, and (3) that City lifeguards had from time to time been stationed on the Point to warn away the public.

Neither section 830 nor the Law Revision Commission comment thereto define "controlled." However, in a discussion of the phrase "owned or controlled," the court in *Low* v. *City of Sacramento* (1970) 7 Cal.App.3d 826, 832-834 [87 Cal.Rptr. 173], said: "Cases decided under the superseded Public Liability Act of 1923 provide interpretive aid. (*Hibbs* v. *Los Angeles County Flood Control Dist.* (1967) 252 Cal.App.2d 166, 171 [60 Cal.Rptr. 364].) In express terms, that act imposed liability upon the governmental entity having authority to remedy the dangerous condition. (Former Gov. Code, § 53051, added by Stats. 1949, ch. 81, and repealed in 1963; *Gillespie* v. *City of Los Angeles* (1950) 36 Cal.2d 553, 556 [225 P.2d 522].) Although authority to remedy the dangerous condition is no longer an express statutory standard, the courts have continued to resort to it. Where control, rather than power to correct the defective condition, is the verbal signal of liability, the courts have continued to equate the two concepts. (*Avey* v. *County of Santa Clara* (1968) 257 Cal.App.2d 708, 712 [65 Cal.Rptr. 181]; *Larson* v. *Santa Clara Valley Conservation Dist.* (1963) 218 Cal.App.2d 515, 523-524 [32 Cal.Rptr. 875, 8 A.L.R.3d 665]; *Schwerdtfeger* v. *State of California, supra,* 148 Cal.App.2d at p. 345.) Thus, in identifying the defendant with whom control resides, location of the power to correct the dangerous condition is an aid. . . . [¶] . . . Where the public entity's relationship to the dangerous property is not clear, aid may be sought by inquiring whether the particular defendant had control, in the sense of power to prevent, remedy or guard against the dangerous condition; whether his ownership is a naked title or whether it is coupled with control; and whether a private defendant, having a similar relationship to the property, would be responsible for its safe condition."

In the case at bench there was no evidence of control as it is defined in the *Low* case. There was no evidence that the City had the authority or power to erect barricades or a fence to keep the public off the Point or to take any other action to alter the conditions existing at the Point. That City lifeguards at times patrolled the Point warning persons away was merely evidence of assistance to or cooperation with the State, and was not evidence of any power, authority or control by the City over the Point. The refusal to give instruction 9 and part of instruction 10 was justified.

k) *Instruction on duty to warn.*

■ The court gave the following instruction: "A public entity has no duty to warn a person of a danger of which he has actual knowledge. Where the injured party had actual knowledge of the danger, a failure to warn of such danger cannot be considered a cause of the injury." Plaintiff claims that the instruction should not have been given because the evidence did not reasonably permit the conclusion that he had actual knowledge of the danger involved when he dove from the Point. As hereinbefore stated there was overwhelming evidence from which the jury could have inferred that plaintiff had actual knowledge of the danger.

8) *No error in giving certain instructions.*

a) *City's instruction 17 (employee's acts of discretion).*

■ Section 820.2 of the Government Code provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Giving an instruction embodying this section was proper under the circumstances on the day in question.

Plaintiff's complaint centers around the word "discretion" as used in the instruction and as interpreted by the appellate courts. In *Johnson v. State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], the court attempted to resolve the continuing confusion between "discretionary" and "ministerial" acts. The court noted that a literal or mechanical interpretation of the word "discretion" is not helpful because it is difficult to conceive of any official act which does not admit of some discretion. The opinion formulated a test which distinguished basic policy decisions as "discretionary," and the implementation of the decision as "ministerial." The opinion stated that the difference between the two is sometimes described as the distinction between the "planning" and the "operational" level.

In the instant case there was evidence that the City did *not* have an agreement with the State to patrol the Point. A decision by the City not to enter into such an agreement with the State would be classified as a basic policy decision and thereby would be a "discretionary" act under the *Johnson* test. The City raised section 820.2 as an affirmative defense.

A party has the right to instructions on its theory of the case if it is reasonable and finds support in the evidence. (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33]; *Greeneich* v. *Southern Pac. Co.* (1961) 189 Cal.App.2d 100, 119 [11 Cal.Rptr. 235].) Therefore, the instruction was properly given. Furthermore, the lifeguards at the beach on the day of plaintiff's injury were faced with an enormous holiday crowd. More specifically, a dangerous rip tide had developed at the City beach and a decision had to be made whether to apply additional guards to that area. This required judgment on the part of the lifeguards as to where the personnel should best be deployed.

In any event, even assuming that the instruction should not have been given it was not reversible error. In view of the evidence which clearly showed that the accident was entirely plaintiff's fault, it is not reasonably possible that the verdict would have been different if the instruction had not been given.

b) *City instruction 14.*

It is based on *Morgan* v. *County of Yuba, supra,* 230 Cal.App.2d 938. However, it incorrectly and confusingly incorporates the rules set forth in that case and should not have been given. Nevertheless, under the evidence in this case the instruction was not prejudicial.

c) *City's instruction 10 (unauthorized acts of employee).*

It is difficult to determine to what evidence this instruction was directed. In any event the error in giving it could only be harmless. In light of the overwhelming evidence against plaintiff, particularly in the areas of (1) immunity of the public entities under the 1963 California Tort Claims Act, and (2) assumption of risk and contributory negligence, it cannot be said that it is reasonably probable that a result more favorable to the plaintiff would have been reached in the absence of error in the matter of instructions. Accordingly, it does not appear that there has been any miscarriage of justice.

9) *No misconduct by the trial judge.*

An examination of the record and the portions indicated by plaintiff discloses no misconduct by the judge.

10) *Denial of motion to proceed in forma pauperis.*

█ Plaintiff's motion for permission to proceed in forma pauperis in the trial court was denied on the sole ground that the contingency agreement between plaintiff and his attorneys provided that they would advance all costs in the action. On this appeal plaintiff seeks review thereof. The ruling cannot be reviewed on appeal. The proper method to have the ruling reviewed would have been for plaintiff to petition this court for a writ of mandamus. (See *Isrin* v. *Superior Court* (1965) 63 Cal.2d 153, 154-155 [45 Cal.Rptr. 320, 403 P.2d 728].) Under such proceeding, if the ruling were determined erroneous, the trial court would have been ordered to rehear the motion and to determine the status of plaintiff as to being or not being a pauper, which status has not been determined. It is too late to have that status determined now. By not following such procedure plaintiff has waived his right to have the ruling reviewed.

The record discloses no reason why the verdict of the jury was not supported, to say the least, on substantial evidence.

Judgment affirmed.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied June 27, 1975, and appellant's petition for a hearing by the Supreme Court was denied July 23, 1975.